UNITED STATES of America,
Plaintiff-Appellee,

v.

Abraham Leroy BAKER and James Osborne, Jr., Defendants-Appellants.

No. 79–5006.

United States Court of Appeals,
Fifth Circuit.

Jan. 2, 1980.
Rehearing and Rehearing En Banc
Denied Feb. 14, 1980.

Manuel W. James, Key West, Fla., Alvin E. Entin, Ronald A. Dion, North Miami Beach, Fla., for defendants-appellants.

Jack V. Eskenazi, U. S. Atty., Paul D. Lazarus, Caridad P. Matthews, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

The most serious question in this case is whether the possession of 51,280 pounds of marijuana on an American flag vessel well outside the three-mile territorial jurisdiction of the United States, but within the twelve-mile "customs waters," is a crime under 21 U.S.C.A. § 841(a)(1), which proscribes the possession of marijuana with the intent to distribute. Although not without some conceptual difficulty, we hold the

statute does prohibit such conduct, and affirm the convictions.

On a routine patrol making random administrative, documentation and safety checks, a U.S. Coast Guard cutter stopped and its officers boarded the CAPTAIN OTIS II, a shrimp boat, near Marquesas Key nine miles off the southern coast of Florida. 14 U.S.C.A. § 89(a). While being escorted through the engine room for the purpose of inspecting the bilges, fire extinguishers and oil pollution placard, a Coast Guard officer discovered some bales of marijuana. A subsequent warrantless search revealed 51,280 pounds of the forbidden substance aboard. The ship and its cargo were seized and the two crew members were arrested.

Defendant Baker was convicted on both a conspiracy count (21 U.S.C.A. § 846) and a substantive count for illegal possession with intent to distribute (21 U.S.C.A. § 841(a)(1)). Defendant Osborne was convicted only for possession with intent to distribute.

The controlling issue in the case is whether the possession with intent to distribute statute reaches beyond the three-mile limit of the "territorial sea," *see United States v. Warren*, 578 F.2d 1058, 1064 n.4 (5th Cir. 1978) (*en banc*), into the so-called "contiguous zone," between three miles and twelve miles from the coast, an area sometimes described as the "marginal sea." *United States v. Louisiana*, 394 U.S. 11, 22, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969); *United States v. Postal*, 589 F.2d 862, 869 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Warren*, 578 F.2d at 1064 n.4; Restatement (Second) of Foreign Relations Law § 15, Note 1 (1965). *See* Ficken, *The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law*, 29 U.Miami L.Rev. 700, 701 n.5 (1975). In this decision we accept the Government's concession that this area is regarded as part of the high seas for purposes of criminal jurisdiction. *See* Article 24(1) of the Convention on the Territorial Sea and the Contiguous Zone, T.I.A.S. No. 5639, 15 U.S.T. 1607, 1612, to which the United States is a party.

■ The issue would appear to have no constitutional implications, but rather depends on congressional intent and the statutes involved. *See Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). Since an early date, it has been recognized that Congress may attach extraterritorial effect to its penal enactments. Chief Justice Marshall noted that a nation's "power to secure itself from injury may certainly be exercised beyond the limits of its territory." *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234, 2 L.Ed. 249 (1804).

■ The statutes in the present case are silent as to their extraterritorial application. Clearly, however, such statutes may be given extraterritorial application if the nature of the law permits it and Congress intends it. *United States v. Mitchell*, 553 F.2d 996, 1002 (5th Cir. 1977). Absent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved.

The necessary *locus*, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*United States v. Bowman,* 260 U.S. 94, 97–98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922).

■ The nature of the enactment here in question mandates an extraterritorial application under the second category described in *Bowman.* These two statutes are part of a comprehensive legislative scheme designed to halt drug abuse in the United States by exercising effective control over the various domestic and foreign sources of illegal drugs. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 101, 21 U.S.C.A. § 801; H.R.Rep.No.1444, 91st Cong., 2d Sess. *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4566, 4567. The power to control efforts to introduce illicit drugs into the United States from the high seas and foreign nations is a necessary incident to Congress' efforts to eradicate all illegal drug trafficking. In other instances, courts have upheld extraterritorial applications of United States law where the nature of the activities warranted a broad sweep of power. *See, e. g., IIT v. Vencap, Ltd.,* 519 F.2d 1001 (2d Cir. 1975) (securities law); *Stegeman v. United States,* 425 F.2d 984 (9th Cir.), *cert. denied,* 400 U.S. 837, 91 S.Ct.

74, 27 L.Ed.2d 70 (1970) (fraudulent transfer and concealment of assets in bankruptcy); *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.,* 131 U.S.App.D.C. 226, 404 F.2d 804 (D.C. Cir. 1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969) (antitrust). *But see Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 290, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (Eight Hour Law not applied extraterritorially); *Reyes v. Secretary of Health, Education & Welfare,* 155 U.S. App.D.C. 154, 159 n.10, 476 F.2d 910, 915 n.10 (D.C. Cir. 1973) (no intention to apply social security laws extraterritorially).

Review of the statutory framework of the Comprehensive Drug Abuse Prevention and Control Act of 1970 compels the conclusion that Congress intended that it have a broad sweep in dealing with all aspects of drug abuse. In enacting the various statutes, Congress noted:

(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

.　　.　　.　　.　　.

(7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

Comprehensive Drug Abuse Prevention and Control Act of 1970 § 101, 21 U.S.C.A. § 801. Indeed, the Act contains a variety of provisions that explicitly cover acts occurring wholly outside the territorial United States. *See, e. g.,* 21 U.S.C.A. § 959 (making it unlawful to manufacture or distribute a controlled substance outside the United States with the intention that it be imported into the United States). In terms of importation, Congress clearly intended that §§ 952 and 963, for example, "apply to persons who commit acts or a series of acts that at least commenced outside the territorial limits of the United States." *United States v. Cadena,* 585 F.2d 1252, 1259 (5th

Cir. 1978). Subchapter II of the Act proscribes various aspects of drug importation, which must, by definition, involve acts outside the territorial United States. 21 U.S. C.A. § 951(a)(1). In defining "import," Congress intended to transcend the rigid question of whether the introduction would be an importation within the meaning assigned by the tariff laws. H.R.Rep.No. 1444, 91st Cong., 1st Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News at 4641.

■ A detailed discussion of the various theories of extraterritorial jurisdiction seems unnecessary. Suffice it to say that the objective territorial theory first developed by Mr. Justice Holmes seems to furnish the best base for the assertion of jurisdiction.

In a case involving interstate extradition of a criminal suspect, Justice Holmes said:

> Acts done outside a jurisdiction, but intended to produce and producing effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.

*Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911). *See also United States v. Columba-Colella*, 604 F.2d 356 (5th Cir. 1979). The objective territorial principle has been asserted successfully where there was proof that defendant's actions either produced some effect within the United States, or even if the defendant never performed any act within the United States, that he was part of a conspiracy in which some coconspirator's activities took place within United States territory. *See United States v. Postal*, 589 F.2d 862; *United States v. Cadena*, 585 F.2d 1252; *United States v. Winter*, 509 F.2d 975 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

Other theories of jurisdiction argued by the Government might also be satisfactory, including the law of the flag, nationality and protective theories. *See* Note, *Jurisdiction with Respect to Crime*, 29 Am.J.Int.L. Supp. 435, 445 (1935).

■ Under the law of the flag principle, for example, jurisdiction may be asserted over a crime committed aboard a United States flag vessel wherever located, so long as Congress has evinced an intention to do so. *See United States v. Bowman*, 260 U.S. at 97–98, 43 S.Ct. 39. In *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), a choice of law decision involving a Jones Act claim, the Supreme Court noted the doctrine is often applied "on the pragmatic basis that there must be some law on shipboard." *Id.* at 585, 73 S.Ct. at 930. Indeed, 18 U.S.C.A. § 7 expressly provides for " 'special maritime and territorial jurisdiction of the United States' " on "[A]ny vessel belonging in whole or in part to the United States or any citizen thereof, . . when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State." 18 U.S.C.A. § 7(1).

In this case, no act was committed within the territorial limits of the United States. Yet, the location of the vessel clearly indicated an intent to distribute marijuana within United States boundaries. Viewed in this way, the crime for which defendants were convicted is nearly identical to the crime of conspiracy to import a controlled substance into the United States, for that crime by definition requires a showing of an intention to bring such substances within the United States territorial limits. 21 U.S. C.A. §§ 951(a)(1), 952(a), 963; *see United States v. Miranda*, 593 F.2d 590, 596–97 (5th Cir. 1979); *United States v. Prince*, 491 F.2d 655, 658 (5th Cir. 1974). We perceive no sound reason to differentiate between the importation aspects of the Controlled Substances Act and the crime of possession with intent to distribute. They are part of the same framework, and were enacted at the same time with the single, straightforward congressional purpose of combating drug abuse in every conceivable way.

■ We note that no overt act in furtherance of the conspiracy need be proved in order to sustain a conviction for conspiracy to import under § 963. *United States v. Thomas*, 567 F.2d 638, 641 (5th Cir.), *cert.*

*denied*, 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978). *See United States v. Postal*, 589 F.2d at 886 n.39; *United States v. Johnson*, 575 F.2d 1347 (5th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir. 1978). The question remains open whether jurisdiction may be maintained over a § 963 conspiracy, without proof that any acts whatsoever took place within United States territory, or whether mere proof of intended territorial effects is enough. *See United States v. Columba-Colella*, 604 F.2d at 360; *United States v. Postal*, 589 F.2d at 886 n.39. In terms of § 841(a)(1), which proscribes the substantive crime of possession with intent to distribute, we hold that so long as it is clear that the intended distribution would occur within the territorial United States, as in this case, jurisdiction may be maintained, where defendants are apprehended outside the territorial waters, and inside the contiguous zone. With jurisdiction maintained over the substantive offense, the district court could rightfully exercise jurisdiction over the conspiracy charge. 21 U.S.C.A. § 846.

■ The statute under which defendants were convicted is designed to preclude the distribution of controlled substances within he United States. The district court did not specifically instruct the jury that distribution within the territorial United States is an element of the crime. An instruction as to the place of intended distribution is unnecessary where possession is found within the United States. We do not think it necessary under the circumstances here, the instructions being otherwise clear and the place of intended ultimate distribution being obviously within the territorial limits of the United States. No such instruction was requested in this case. It was not plain error to fail to give it. We point out that defendants did request an instruction that mere possession outside the territorial limits is not a crime. *See United States v. Warren*, 578 F.2d at 1062 n.2. That instruction was properly refused by the district court, because defendants were charged with possession with intent to distribute more than 51,000 pounds of marijuana, a different and far more serious offense than simple posses-sion, and a crime which clearly was intended to have effects within the territorial United States.

### Additional Issues

Defendants argue they were denied access to certain *Brady* material in two respects. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First, the Government destroyed a Coast Guard "hit list" of vessels suspected of engaging in illegal activities. Second, the district court refused access to a Coast Guard operations plan for administrative searches. Defendants claim this evidence would have shown the purported administrative search to be pretextual.

■ The evidence showed the decision to board the CAPTAIN OTIS II was made well before the Coast Guard commanding officer knew the ship's identity. The CAPTAIN OTIS II did not even appear on the list, although a ship named the CAPTAIN OTIS was on the list. The list was destroyed routinely before the entry of the district court's discovery order. The list in light of these facts could not have been material to defendants' guilt, as contemplated by *Brady*. *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Villalon*, 605 F.2d 937, 939 (5th Cir. 1979); *United States v. Beasley*, 576 F.2d·626, 630 (5th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Hildebrand*, 506 F.2d 406, 408, 409 (5th Cir. 1975).

■ The district court viewed the Coast Guard operations plan *in camera* and found that none of the regulations encouraged Coast Guard officers to exceed their administrative authority, or to use administrative and safety inspections as a ruse to discover other possible violations, as defendants had argued. No error has been shown. *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979).

■ An investigating officer's suspicion that contraband may be discovered does not invalidate an otherwise valid search, where it is clear that the procedure is valid, and is

not merely a pretext for a search. *See United States v. Hall*, 565 F.2d 917, 922 (5th Cir. 1978). The district court correctly found the search was authorized under the Coast Guard's statutory authority, 14 U.S. C.A. § 89(a), and was not a pretext. *United States v. Cadena*, 585 F.2d 1252; *United States v. Warren*, 578 F.2d 1058. There was no Fourth Amendment violation.

Defendants argue that the officers lacked probable cause for the arrest. The district court found that the Coast Guard officer discovered the marijuana bales in plain view as he was being escorted on a valid administrative and documentation inspection of the bilges, fire extinguishers and oil pollution placard in the engine room. The officers were therefore justified in seizing the evidence and making the arrest in the course of the inspection. *United States v. Warren*, 578 F.2d at 1065.

Finally, defendants claim they were prejudiced because Juror No. 3 slept through the district court's instructions. Defendants' respective counsel did not mention the point until the jury had retired, and did not urge the court to ascertain whether the juror was actually asleep. No grounds for reversal have been demonstrated on this argument.

AFFIRMED.