679 F.2d 423
 UNITED STATES of America, Plaintiff-Appellee,
v.
Alvaro CHAPARRO-ALMEIDA, William Granja-Moreno, Jorge Luis
Herrara-Mendez, Elio Barros-Epinayo, Salustio Castro-Perea,
Omar Obregon-Mosquera, Osvalda Barrios-Miranda, Jose
Caicedo-Bustamante, Adolfo Angulo-Quinones, Roberto
Miranda-Cabeza, Lino Padilla-Herzao, Hugo Arboleda-Hurtado,
Luis Alberto Murillo-Lopez, Vincente Robinson-Bobb, Wilfran
Hernandez-Blanquiseth and Carlos Nicolas Caicedo-Londono,
Defendants-Appellants.
 No. 81-3181
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 June 28, 1982.
 Kurt Marmar, Coral Gables, Fla., for defendants-appellants.
 Patrick J. Fanning, Michael Schatzow, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before RUBIN, SAM D. JOHNSON and GARWOOD, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 Once again, we are urged to suppress the results of a random search of an American vessel made on the high seas by the Coast Guard. Finding under settled precedent that the search was valid, we affirm the convictions of the vessel's captain and crew of conspiracy to possess marijuana with intent to distribute, possession of marijuana with intent to distribute, and conspiracy to import marijuana.
 
 
 2
 The M/V POLARIS, a U. S. registered vessel, was approached by the Coast Guard while circling seven nautical miles off the Louisiana coast.[1] When ordered to stand by for boarding, the POLARIS fled south. After a six-hour chase, the Coast Guard cutter, the POINT SPENCER, succeeded in stopping the POLARIS and boarded the vessel seventy-two miles south of the Louisiana coast. The smell of marijuana was pervasive and the Coast Guard crew detected it before the hatches were opened. Bales of marijuana were found in the cargo hatches and also in a passageway leading from the crew's quarters to the engine room. The searchers found approximately seventy tons of marijuana in 3,995 bales. The vessel also carried rollers or conveyors of the kind used to form a transportation system to move small packages. These are not usually carried aboard vessels of the POLARIS type. The vessel was equipped with a type of satellite navigation equipment used for long range navigation more elaborate than the kind of equipment usually used by vessels like the POLARIS. The captain and the crew of the vessel, all Colombians, were charged with: Count 1-conspiracy to possess marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1), 846; Count 2-possession of marijuana with intent to distribute, 21 U.S.C. § 841(a), 18 U.S.C. § 2; and Count 3-conspiracy to import marijuana, 21 U.S.C. §§ 952(a), 960(a)(1), 963.[2]
 
 
 3
 The testimony of the vessel's captain, Vincente Robinson-Bobb, constituted the sole defense offered by the sixteen defendants. He testified that the crew had no knowledge of the cargo until they were at sea, that he himself thought he would violate no United States statute so long as he stayed out of United States territorial waters,[3] and that two Americans had been on the vessel during the voyage, but left the POLARIS to get vessels to be used to transport the marijuana to shore just before the Coast Guard arrived. The jury found the captain and all of the crew guilty on all three counts. The defendants received concurrent sentences of varying lengths.
 
 I.
 
 4
 The defendants moved to suppress all of the items seized in the search of the POLARIS. The motion to suppress was submitted on a stipulation that the Coast Guard vessel POINT SPENCER was on a roving law enforcement patrol and that the POLARIS was the third vessel randomly stopped on the morning of the search.
 
 A.
 
 5
 The defendants contend that Coast Guard searches for narcotics violations are prohibited by the Posse Comitatus[4] Act, 18 U.S.C. § 1385. That statute's terms prohibit the use of the Army and Air Force in civilian law enforcement.[5] Because the statute's prohibition has been extended to all branches of the armed services[6] and the Coast Guard is, by statute, "a military service and a branch of the armed forces of the United States at all times," 14 U.S.C. § 1,[7] the defendants contend that it precludes law enforcement activities by the Coast Guard.
 
 
 6
 Despite the generality of the extension language, the Posse Comitatus Act is not applicable to the Coast Guard. Jackson v. State, 572 P.2d 87, 93 (Alaska Sup.Ct.1977) ("the law enforcement role established for the Coast Guard by Congress indicates that Congress did not intend to make the Posse Comitatus Act applicable to the United States Coast Guard"). Indeed, § 1385 excepts from the Act's prohibition "cases and circumstances expressly authorized by ... Act of Congress." The Coast Guard is specifically authorized by statute to "utilize its personnel and facilities to assist any Federal agency, State, Territory, possession, or political subdivision thereof, or the District of Columbia, to perform any activity for which such personnel and facilities are especially qualified." 14 U.S.C. § 141. Unlike the other branches of the armed forces, the Coast Guard is also assigned the duty to "enforce or assist in the enforcement of all applicable Federal laws on and under the high seas." 14 U.S.C. § 2. The Coast Guard has plenary authority to stop and board any American flag vessel on the high seas. 14 U.S.C. § 89(a).
 
 
 7
 None of the authorities cited by the defendants supports an extension of the Posse Comitatus Act to the Coast Guard, and we see no reason to disregard the explicit statutory command to the Coast Guard, which differentiates its functions from those of the other branches of the armed forces. We, therefore, do not consider whether violation of the Posse Comitatus Act would require suppression of evidence thereby obtained.[8]
 
 B.
 
 8
 The defendants also contend that the Coast Guard may not make random searches in the absence of probable cause or reasonable suspicion. This court, however, has held to the contrary, approving such searches on the high seas[9] under the statutory authority of 14 U.S.C. § 89(a). E.g., United States v. Williams, 617 F.2d 1063, 1075 (5th Cir. 1980) (en banc) (§ 89(a) "gives the Coast Guard plenary power to stop and board any American flag vessel anywhere on the high seas in the complete absence of suspicion of criminal activity");[10] United States v. Warren, 578 F.2d 1058, 1064-65 (5th Cir. 1978) (en banc), modified en banc on other grounds, 612 F.2d 887, cert. denied, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).[11]
 
 
 9
 The defendants argue, however, that Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), requires a different holding on the legality of the stop and search. Delaware v. Prouse was a land-based search. The Supreme Court held that a random stop of an automobile and detention of its driver in order to check the driver's license or the automobile's registration is unreasonable under the fourth amendment in the absence of an articulable and reasonable suspicion that a violation will be found, or that the vehicle or occupant is otherwise subject to seizure for violation of the law. A majority of Fifth Circuit judges sitting en banc in Williams rejected the applicability of the entire line of land related cases to sea searches. United States v. Williams, 617 F.2d at 1079.[12] The court again specifically rejected the same argument in United States v. Espinosa-Cerpa, 630 F.2d 328, 333-34 (5th Cir. 1980).
 
 
 10
 For these reasons, we conclude that the motion to suppress was properly denied.[13]
 
 II.
 
 11
 The defendants contend that their motion for judgment of acquittal on counts 1 and 2, conspiracy to possess marijuana with intent to distribute and possession of marijuana with intent to distribute, should have been granted.
 
 
 12
 The well-established standard for reviewing the sufficiency of the evidence to support a defendant's conviction is whether "there is substantial evidence taking the view most favorable to the government to support it." United States v. Bland, 653 F.2d 989, 995-96 (5th Cir.) (citations omitted), cert. denied, --- U.S. ----, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). Accord, United States v. Alfrey, 620 F.2d 551, 555 (5th Cir.), cert. denied, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). Giving the government the benefit of this reading of the evidence, it is sufficient to support the convictions on counts 1 and 2.
 
 A.
 
 13
 Count 2 of the indictment charged the defendants with possession of marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). The term "distribute" is defined in 21 U.S.C. § 802(11) to mean "to deliver (other than by administering or dispensing) a controlled substance." "Deliver" is defined in 21 U.S.C. § 802(8) as "the actual, constructive, or attempted transfer of a controlled substance whether or not there exists an agency relationship."
 
 
 14
 The facts in this case indicate that the defendants had the intention of delivering or transferring the marijuana. We repeat some of the testimony already adverted to. At the time the Coast Guard first spotted the POLARIS, the vessel was seven miles south of the Louisiana coast. The boat, an offshore supply vessel, was steaming in tight circles. The commander of the POINT SPENCER, the Coast Guard vessel, testified that this fact first called his attention to the vessel because, in the normal course of events, the vessel would "head( ) out directly to a rig to make a delivery." The commander also testified that he intercepted a suspicious radio transmission, "Is that you, Robbie, is that you, Robbie." He also testified that, as soon as the Coast Guard vessel came within close range of the POLARIS, the POLARIS began steaming south at its maximum speed. In addition, the Coast Guard discovered conveyor equipment on the POLARIS of a type not usually carried on vessels like the POLARIS. Presumably, such equipment would be used to transfer the marijuana from the POLARIS to another vessel.
 
 
 15
 Robinson-Bobb, the captain of the POLARIS, testified that two Americans, identified only as Sam and Joe, travelled on the POLARIS from Colombia and left the POLARIS in a speedboat when the POLARIS was about seven miles off the Louisiana shore. Robinson-Bobb also testified that, before Sam and Joe left, Sam told him, "that he is going ashore, he and his companion, ship going ashore and see what is happening. To see if he can grab the people to come back and pick up their stuff." Robinson-Bobb further testified that one of the Americans "told me before he went away, he says if I have to call him don't call him by his name Joe, say Charlie. So I said, Charlie, this is Robbie, waiting still, waiting seven miles from the coast." From all of these facts, the jury could reasonably infer that the POLARIS was waiting off the United States coast to transfer the marijuana to another boat operated by the two Americans who would return with the marijuana to the United States.
 
 
 16
 In United States v. Baker, 609 F.2d 134 (5th Cir. 1980), the convictions of two Americans for possession of marijuana with intent to distribute were affirmed even though their vessel, loaded with 51,280 pounds of marijuana, was first spotted by the Coast Guard nine miles off the coast of Florida, outside the territorial sea of the United States. We found in Baker, that "the location of the vessel clearly indicated an intent to distribute marijuana within United States boundaries." Id. at 138.[14] See also United States v. Alfrey, 620 F.2d 551 (5th Cir. 1980) (taking into account "the probable length of the voyage, ... the large quantity of marijuana on board, which made it indisputable that (the defendants) had knowledge of the marijuana, and the necessarily close relationship between the captain of the trawler and his two man crew"); United States v. Whitmire, 595 F.2d 1303, 1316 (5th Cir. 1979) (affirming a conviction of possession with intent to distribute because "where other circumstantial evidence, such as one's attitude, conduct or relationship to the driver, is sufficiently probative, proximity to the contraband coupled with inferred knowledge of its presence will support a finding of guilt"), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); United States v. Christian, 505 F.2d 94, 96 (5th Cir. 1974); United States v. Egan, 501 F.Supp. 1252 (S.D.N.Y.1980) ("Because of the size of the shipment seized and the location of the (vessel), an intent to distribute marijuana can be inferred."); see United States v. DeWeese, 632 F.2d 1267 (5th Cir. 1980) (court applied the Alfrey factors to uphold a conviction for conspiracy to import marijuana).
 
 
 17
 "Intent to distribute a controlled substance under 21 U.S.C. § 841 may be inferred solely from possession of a large amount of the substance." United States v. Grayson, 625 F.2d 66, 66 (5th Cir. 1980). Accord, United States v. Mazyak, 650 F.2d 788, 791 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); United States v. DeLeon, 641 F.2d 330, 335 (5th Cir. 1981); United States v. Rodriguez, 585 F.2d 1234 (5th Cir. 1978), aff'd en banc on other grounds, 612 F.2d 906 (1980), aff'd sub nom. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). In this instance, the defendants possessed over seventy tons of marijuana.
 
 
 18
 Count 2 of the indictment also cited 18 U.S.C. § 2, which provides, in part, "(w)hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." Under this provision, the Colombian crew members can be held liable as principals if they aided and abetted the commission of the substantive offense.
 
 B.
 
 19
 Count 1 of the indictment charged the defendants with conspiracy to possess marijuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) & 846.[15] Proof of conspiracy to possess with intent to distribute does not require that the government prove an overt act in furtherance of the conspiracy. E.g., United States v. Pool, 660 F.2d 547, 559-60 (5th Cir. 1981); United States v. Glasgow, 658 F.2d 1036, 1040 (5th Cir. 1981); United States v. Garcia, 655 F.2d 59, 62 (5th Cir. 1981).[16]
 
 
 20
 Convictions for this offense have been affirmed in circumstances less incriminating than those surrounding the arrest of the defendants in this case. In United States v. Ricardo, 619 F.2d 1124 (5th Cir.), cert. denied, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980), we affirmed the convictions of seven defendants (five Colombians and two Americans) for conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute it. The vessel, of unknown nationality, was boarded by the Coast Guard 125-150 miles offshore. The court held that the government's proof of a planned rendevous sixty miles off the Texas coast to unload the vessel, the proximity of the United States coast, and the general heading of the ship indicated that "the object of appellants' plan had consequences within the United States." Id. at 1128. The absence of an overt act in United States territory was not crucial because the "fact that appellants intended the conspiracy to be consummated within the territorial boundaries satisfies jurisdictional requisites." Id. at 1129. See also United States v. Diaz, 655 F.2d 580, 584 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); United States v. Mazyak, 650 F.2d 788, 791 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); United States v. Ayala, 643 F.2d 244, 248 (5th Cir. 1981); United States v. Jonas, 639 F.2d 200, 205 (5th Cir. 1981) (27,000 pounds of marijuana found on boat 60-80 miles off Florida Keys. Conviction for conspiracy to possess marijuana with intent to distribute affirmed. "Where a conspiracy statute does not require proof of overt acts, the jurisdictional requirement that the proscribed acts have an effect within United States territory may be satisfied by evidence that the conspirators intended their conspiracy to be consummated within United States territory."); United States v. Mann, 615 F.2d 668, 670 (5th Cir. 1980) ("(h) aving determined that defendants planned to import their cargo, the jury was entitled to infer from the facts before it that some plan had been made for its distribution"), cert. denied, 450 U.S. 794, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981); United States v. Postal, 589 F.2d 862, 891 (5th Cir.) (statement by one of the defendants that they had made a mistake in not waiting beyond the twelve-mile limit for the pickup boats "unequivocally demonstrates that it was the understood objective of the conspiracy to introduce the marijuana into the United States and to sell it there"), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).
 
 
 21
 The presence of the defendant crew members on the POLARIS, without more, is of course not sufficient to sustain their convictions. In United States v. Willis, 639 F.2d 1335 (5th Cir.), rehearing denied, 646 F.2d 189 (5th Cir. 1981), we reversed the convictions of two crew members for conspiracy to import marijuana and conspiracy to possess with intent to distribute because "the government never offered any evidence to support an inference that the two crew members knew that the hold contained marijuana-other than their mere presence on the boat." 639 F.2d at 1338. In our opinion denying rehearing, we reaffirmed this conclusion and distinguished Willis from Alfrey. 646 F.2d at 190. The defendants also rely on United States v. Cadena, 585 F.2d 1252 (5th Cir. 1978). We there affirmed the conviction of a Colombian captain,[17] from whose vessel, anchored 200 miles off the Florida coast, marijuana was delivered to an American vessel, for conspiracy to import but reversed his conviction for conspiracy to distribute, holding that there was no evidence that Cadena knew of a distribution scheme or that he had any "interest in or awareness of what plans, if any, had been reached to dispose of the marijuana once he reached these shores." Id. at 1266. The vessel in Cadena, however, was 200 miles from the Florida coast and there was no supporting evidence of an intention to deliver the contraband to the United States. In the instant case, the evidence, fully reviewed above, was sufficient to warrant the conclusion that distribution in the United States was intended.
 
 
 22
 For these reasons, we AFFIRM the convictions on counts 1, 2 and 3 as to all defendants.
 
 
 
 [1]
 The vessel was seven nautical miles due south of the Louisiana coast and five nautical miles from the nearest land
 
 
 [2]
 The defendants were acquitted of a count alleging actual importation of marijuana, 21 U.S.C. §§ 952(a), 960(a)(1)
 
 
 [3]
 The territorial waters extend to three miles from the coast. See note 9 infra
 
 
 [4]
 Posse Comitatus means: "The power or force of the country. The entire population of a country above the age of fifteen, which a sheriff may summon to his assistance in certain cases; as to aid him in keeping the peace, in pursuing and arresting felons, etc." Black's Law Dictionary 1324 (rev. 4th ed. 1968)
 
 
 [5]
 Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years or both
 18 U.S.C. § 1385.
 
 
 [6]
 United States v. Walden, 490 F.2d 372, 374-75 (4th Cir.), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974), specifically mentioned that the statute should be extended to cover the Navy and the Marines and more broadly stated that "consideration of the legislative history of the Act and interpretative opinions reveals a policy applicable to all of the armed services." 490 F.2d at 375. Cf. Note, Honored in the Breach: Presidential Authority to Execute the Laws with Military Force, 83 Yale L.J. 130, 144 (1973) ("The lacuna of the Posse Comitatus Act merely means that the use of the Navy or Marines to execute the laws other than as provided by statute is not a criminal offense.")
 
 
 [7]
 The statute also provides: "The Coast Guard shall be a service in the Department of Transportation, except when operating as a service in the Navy." 14 U.S.C. § 1
 
 
 [8]
 See United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979) ("(A)ssuming without deciding that there was a violation (of the Posse Comitatus Act), application of an exclusionary rule is not warranted." In the event of "widespread and repeated violations" of the Act an exclusionary rule can later be fashioned.); United States v. Walden, 490 F.2d 372, 376-77 (4th Cir.), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974)
 
 
 [9]
 The high seas begin three miles from the coast and extend seaward. The territorial sea extends to three miles from the coast. The contiguous zone extends from three to twelve miles from the coast. The term international waters refers to the seas beyond the twelve mile limit. See United States v. Williams, 617 F.2d 1063, 1073 n.6 (5th Cir. 1980) (en banc); United States v. Warren, 578 F.2d 1058, 1064 n.4 (5th Cir. 1978) (en banc), modified en banc on other grounds, 612 F.2d 887, cert. denied, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980)
 Therefore, the Coast Guard had plenary authority to stop and board the POLARIS if it was in the high seas area which includes the contiguous zone (where the vessel was first ordered to "heave to") or in international waters (where the Coast Guard finally boarded the vessel). See also 33 C.F.R. § 2.05-1(a) (1981) (the " 'high seas' means all waters which are neither territorial seas nor internal waters").
 
 
 [10]
 I concurred only in the result of this case. While I adhere to the views expressed in my separate opinion, I agree that the majority opinion states what is now the law of the circuit
 
 
 [11]
 Accord, United States v. Mazyak, 650 F.2d 788, 790 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); United States v. Jonas, 639 F.2d 200, 202-03 (5th Cir. 1981); United States v. DeWeese, 632 F.2d 1267, 1269 (5th Cir. 1980) (stating this circuit's position that the Coast Guard has plenary authority under § 89(a) "to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and narcotics violations " (emphasis added))
 
 
 [12]
 But see United States v. Williams, 617 F.2d 1063, 1095 (5th Cir. 1980) (en banc) (Rubin, J., concurring in result) ("I would hold that the seizure and search of vessels on the high seas is governed by the same principles as the stopping and searching of automobiles, planes and other vehicles."); United States v. Piner, 608 F.2d 358, 361 (9th Cir. 1979) (requiring reasonable suspicion of illegality or a fixed administrative standard for boardings pursuant to § 89(a)); 3 W. LaFave, Search and Seizure § 10.8(f), at 117 (Supp.1982) ("It is certainly not fanciful to suggest that the Prouse decision casts a rather heavy cloud over the Fifth Circuit's rulings that Coast Guard inspections may be conducted purely at random."); Note, High on the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea, 93 Harv.L.Rev. 725, 741 (1980) ("Application of fourth amendment balancing principles to vessel safety searches strongly suggests that the current practice of completely discretionary random searches at sea is unconstitutional.")
 I continue to adhere to the views I have previously expressed, but I acknowledge that the circuit has adopted a different view and that I am required to follow it.
 
 
 [13]
 The defendants also argue that the search was not a lawful border search or a lawful customs search under 19 U.S.C. § 1581(a). Given our disposition on the basis of 14 U.S.C. § 89(a), we find it unnecessary to deal with these issues
 
 
 [14]
 In addition, we held that "so long as it is clear that the intended distribution would occur within the territorial United States, as in this case, jurisdiction may be maintained, where defendants are apprehended outside the territorial waters, and inside the contiguous zone." 609 F.2d at 139
 
 
 [15]
 21 U.S.C. § 846 provides that "(a)ny person who ... conspires to commit any offense defined in this subchapter is punishable ...."
 
 
 [16]
 In Garcia we stated:
 Proof of the conspiracy and of the defendant's participation in it is sufficient.... Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions in the circumstances.... (I)f the contemplated crime has been committed by any conspirator, the other conspirators, as partners of each other, may be charged as principals in the perpetration of the crime.
 655 F.2d at 62.
 
 
 [17]
 In Cadena, relying on the concurrent sentence doctrine, we did not review the sufficiency of the evidence against Cadena's crew. United States v. Cadena, 634 F.2d 1252, 1266 (5th Cir. 1978). In Alfrey, however, we noted that the concurrent sentence doctrine should not be applied where the error alleged concerns guilt or innocence. United States v. Alfrey, 620 F.2d 551, 557 n.5 (5th Cir. 1980)