**UNITED STATES of America**

v.

**Andrea CAFIERO.**

**No. CR. MJ–02–245–JLA.**

United States District Court,
D. Massachusetts.

June 24, 2002.

Kim West, Asst. United States Attorney, United States Attorney's Office Boston, MA, for Plaintiff.

James W. Lawson, Oteri, Weinberg & Lawson, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON PROBABLE CAUSE AND DETENTION

ALEXANDER, United States Magistrate Judge.

The defendant, Andrea Cafiero, appeared before this Court on June 5, 2002 for an initial appearance pursuant to a complaint charging him with violation of 21 U.S.C. § 841(a)(1) (knowingly and intentionally possessing with intent to distribute cocaine). Assistant United States Attorney Kimberly West represented the government. After review of the defendant's financial affidavit, the Court appointed Attorney James Lawson to represent him. The defendant returned to this Court for a probable cause and detention hearing on June 7, 2002, and the Court allowed a

defense motion to continue the hearing to June 14, 2002.

At the probable cause and detention hearing, the Court heard the testimony of Special Agent Margaret G. Cronin of the Federal Bureau of Investigation ("FBI"), who was involved in the arrest of the defendant. Special Agent Cronin recounted that on June 5, 2002, the defendant was a passenger on Air Europe flight number 2065 bound from Cancun, Mexico to Rome, Italy. While the aircraft was en route to Italy and traveling in international airspace, the defendant allegedly created a disturbance onboard the aircraft. The government contends that the defendant was verbally abusive to members of the flight crew and passengers, that he physically assaulted a flight attendant and the captain of the airship, and that he attempted to force his way into the cockpit. A group of passengers and members of the crew were able to stop the defendant from entering the cockpit, and eventually physically subdued and restrained the defendant who despite having been forced into submission, purportedly continued to threaten to kill the flight attendants and passengers who secured him. The agent also testified that the captain requested that physicians onboard the flight sedate the defendant, but that the physicians declined because they had some concern that the defendant might be under the influence of a controlled substance or alcohol.[1]

Given the zeitgeist of increased security, vigilance, and caution that permeates the nation in the wake of the pernicious events of September 11th, it is not surprising that upon learning of the incidents onboard Air Europe Flight 2065, federal authorities ordered two United States Air Force "fighter" jets (F–16s) to scramble into the sky and "escort" the plane down to Logan International Airport ("Logan") in Boston. The record before the Court does not suggest that the captain of the flight requested a landing on American soil, or even that he wished for assistance. Not insignificantly, Special Agent Cronin's affidavit, offered previously to the Court in support of the complaint in this matter and referenced in the detention and probable cause hearing, states simply that the FBI was notified of the disturbance on board and that as a consequence of the disturbance the aircraft was diverted to Boston. At the probable cause and detention hearing, Special Agent Cronin again testified that "the FAA diverted the plane." There was no evidence adduced at the hearing that contradicts the indication that the command to land at Logan was issued by American authorities acting on their own. In any event, the interception and seizure of Flight 2065 was effective, and the plane was brought safely from the skies to Boston.

Upon arriving at Logan, the plane was met by law enforcement personnel, including Special Agent Cronin and Massachusetts State Police ("MSP") troopers. Special Agent Cronin testified that she met the plane and upon the hatch being opened she could observe the defendant restrained by belts and tape. She avers that at that time, he continued to act in a belligerent manner and that he denied any wrongdoing. Special Agent Cronin and/or the troopers that were with her took custody of the defendant and transported him from the plane to MSP barracks. There was no evidence offered at the hearing that suggests any other law enforcement or cus-

---

1. There was further testimony that the defendant was intoxicated with alcohol at the time of the incident, and that he had previously behaved inappropriately on an Air Europe flight the week prior, during which he allegedly smoked a cigarette in the plane's bathroom and otherwise acted in a demanding, boorish manner.

toms agency was involved in the custody and transport of the defendant.

Notably, it appears that at the time that American authorities took custody of the defendant a decision had been made that he *would not be charged* with federal criminal statutes proscribing interference with a flight crew. According to Agent Cronin's testimony, the decision was made in part because the incident occurred in international airspace and because the air carrier and its flight crew were not American.[2] Thus, there is not an insignificant question here as to what legal basis and authority were used to take custody of the defendant at that time—a question that remains unanswered at this juncture.[3] Nevertheless, Special Agent Cronin testified that pursuant to a search of the defendant's person while he was being held at the MSP barracks, 184.5 grams of a substance believed to be cocaine was found in his front pants pocket.

■ Critically here, the possession of that contraband in the United States is the sole basis for the ensuing charges against the defendant for violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute cocaine).[4] As the Court noted at the probable cause and detention hearing, therein lies the salient inquiry for this Court: given that the defendant is an Italian citizen who was on a non-domestic airline on an international flight from Mexico to Italy *with no scheduled stops* in the United States, and that the plane was in international airspace at the time it was ordered down by American authorities, is there an adequate basis for finding that there is probable cause to believe that the defendant committed the offense charged? In passing upon this question, the Court has the benefit of cogent oral arguments by counsel at the probable cause and detention hearing, and the memoranda of law submitted thereafter by the parties. After careful consideration and review of the authority submitted, the Court is not persuaded that it may properly find that probable cause is extant.

Essentially, the government avers that this Court can find jurisdiction and probable cause are present by a binary analysis. First, the government contends, the amount of cocaine found in the defendant's possession is sufficiently substantial to warrant an inference that the cocaine was bound for distribution rather than personal consumption. *See, e.g., Latham,* 874 F.2d at 862–63. This contention is unchallenged by the defendant and is supported by ample case law.

Second, and more critically here, the government asseverates that the mere fact that the defendant possessed the cocaine in the United States is sufficient to find

---

2. The decision not to charge the defendant with interference with a flight crew in no way detracts from the gravity of the defendant's conduct. Due to his actions, the lives of hundreds of people onboard the plane were grossly and unjustifiably endangered.

3. Indeed, Special Agent Cronin could not offer any substantive testimony regarding whether the defendant was arrested or a booking process occurred. For example, she could not state whether the defendant was given his *Miranda* warnings, photographed, or fingerprinted. The Court was not made aware that the defendant was charged with

any crime at the time of custody, and other than the instant complaint, there is no indication that any such charges were sought subsequently.

4. The elements of the crime of possession with intent to distribute cocaine in violation of Section 841(a)(1) are: "the defendant possessed cocaine, either actually or constructively, that he did so *with a specific intent to distribute the cocaine* over which he had actual or constructive possession, and he did so knowingly and intentionally." *United States v. Latham,* 874 F.2d 852, 863 (1st Cir.1989) (emphasis supplied).

that he intended to distribute it in the United States. In so suggesting, the government contends that the manner in which the defendant appeared in the United States, i.e., the involuntariness of his arrival, is immaterial to the instant analysis. A casual reading of the government's submitted authority might indeed lead to such a conclusion. A more probing examination, however, leads to a different conclusion.

The collocation of cases presented by the government all entail factual and/or legal scenarios that are distinguishable from the case *sub judice*. Although a majority of the cases cited by the United States involve prosecutions pursuant to 21 U.S.C. § 841(a)(1), they also present defendants who willingly entered the United States on flights that had *scheduled stops* within this nation's borders. *See, e.g., United States v. McKenzie*, 818 F.2d 115, 120 (1st Cir.1987) (refusing to permit an exception from prosecution for violation of Section 841 for "international travelers *who choose to pass through this country,*

however briefly") (emphasis furnished); *United States v. Bonfant*, 660 F.Supp. 509, 511 (D.P.R.1987) (defendant was a passenger on an international flight with a scheduled stop in the United States), *aff'd*, 851 F.2d 12 (1st Cir.1988). The majority of these cases also present scenarios in which contraband is uncovered by customs officials acting pursuant to their broad, but proper authority. In this line of cases, the federal courts nearly universally reject challenges based on customs agents' authority to search and seize from "in-transit" passengers who do not need to present themselves to customs. In such an instance, the government rightfully may prosecute the defendant for possession with intent to distribute the narcotics. *McKenzie*, 818 F.2d at 117; *Leiser v. United States*, 234 F.2d 648, 650 (1st Cir.), *cert. denied*, 352 U.S. 893, 77 S.Ct. 133, 1 L.Ed.2d 87 (1956);[5] *United States v. Montoya*, 782 F.2d 1554, 1555 (11th Cir.1986); *United States v. Muench*, 694 F.2d 28, 32 (2nd Cir.1982), *cert. denied sub nom. Lewis v. United States*, 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983); *United*

---

**5.** As noted previously, the sole charge against this defendant is violation of Section 841(a)(1). Had this defendant been charged with a customs offense, *Leiser* would likely control the outcome. But in the context of the facts and charge presented here, it is rather inapposite because in *Leiser*, the defendant was charged with knowingly, fraudulently, and willfully smuggling contraband (more than five hundred carats of diamonds) into the United States without making mandated declarations to customs authorities. *See* 234 F.2d 648–49. Immediately prior to his arrest, the defendant had been onboard a plane traveling from Frankfort, Germany via Paris, France en route to a final destination of Gander, Newfoundland, Canada. *Id.* Because the plane "overflew" the airport at Gander, it arrived in Boston contrary to the defendant's expectation. *Id.* at 648–49. The defendant made arrangements to board the next available flight for Gander before any customs official approached him, and he failed to declare the diamonds in his possession. *Id.* at

649. Given this failure, the diamonds were seized and the defendant was charged with customs violations. *Id.* at 648–49. Thereafter, he was acquitted after trial, *id.* at 649, and sought return of the diamonds asseverating, *inter alia*, that "goods brought into the United States by wreck, distress of weather, or vis major are exempt from customs and other local laws of the United States." *Id.* at 649. In rejecting that contention, the First Circuit found that the customs statutes implicated in the case did not permit an exemption for vessels arriving on American soil due to distress, and expressly found that the case did not present an issue of whether there was intent to violate the statutes. *Id.* at 650. The Court is not persuaded that a holding that there is no exemption for purposes of customs in a customs-based prosecution is properly applied by this Court as controlling precedent in a specific intent controlled substance act prosecution where customs are not implicated.

States v. Gomez–Tostado, 597 F.2d 170, 173 (9th Cir.1979); Bonfant, 660 F.Supp. at 511; United States v. Madalone, 492 F.Supp. 916, 918 (S.D.Fla.1980).

▉ More importantly for purposes here, the federal courts similarly reject the contention that the defendant may not be prosecuted pursuant to Section 841(a)(1) merely because the defendant intends to distribute the controlled substance outside of the United States so long as the defendant enters the United States in furtherance of that intent. McKenzie, supra.[6] Put another way, "it has been consistently

held that an intent to distribute in a foreign country satisfies the intent element under 21 U.S.C. § 841(a)(1) 'so long as the intent coincides at some point with possession in the United States.'" Bonfant, 660 F.Supp. at 511, citing Montoya, 782 F.2d at 1555; Muench, 694 F.2d at 33; Madalone, 492 F.Supp. at 920; Gomez–Tostado, 597 F.2d at 172. Thus, the body of case law submitted by the government—which contains forceful language that superficially supports the government's arguments here—is predicated upon cases in which there was no extraterritorial seizure and involuntary entry into the United States.[7]

6. For example, in McKenzie, upon which the government places much reliance, the court passed upon the defendant's conviction for several controlled substances act violations, including the violation at issue here, 21 U.S.C. § 841(a)(1). See 818 F.2d at 117. There, the defendant was aboard a non-domestic flight operated by British West Indies Airlines that was bound from Jamaica to Antigua with a scheduled stop in Puerto Rico. Id. Upon arriving at an airport in Puerto Rico, customs officials inspected the plane's cargo areas and found that the defendant's luggage did not have a claim ticket with proper validation. Upon further examination and inspection, the luggage was found to contain approximately thirty five pounds of marijuana. Id. The defendant was convicted subsequently, and on appeal raised a single issue: whether the search of his luggage was proper. Id. More specifically, the defendant claimed that it was not, ave-ring that the customs officers had no authority to conduct the search because there was not probable cause to believe that a crime had been committed and because there was no basis to otherwise search a bag belonging to a foreign citizen who had no intention of entering the United States. Id. In rejecting this claim, the First Circuit foreclosed the use of the "Pentapati exception," see United States v. Pentapati, 484 F.2d 450, 451 (5th Cir.1973), and held that although the defendant may have intended to distribute the narcotics outside the United States, "the place of intended distribution is not important so long as such intent is established together with the fact of possession within the United States." 818 F.2d at 118 (emphasis in original) (citations omitted).

The First Circuit also relied upon the holding in United States v. Muench, 694 F.2d 28 (2nd Cir.1982), cert. denied, 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983), wherein the Second Circuit similarly held that the government need not prove that the defendant had an intent to distribute in the United States or to remain in the country indefinitely. See 818 F.2d at 119. Rather, the First Circuit adopted the Second Circuit's conclusion that "actual possession on United States territory supplies the jurisdictional nexus" for Section 841(a)(1). Id.,citing Muench, 694 F.2d at 33. Muench, like Pentapati and McKenzie, involved a scheduled stop in the United States.

7. Despite that distinction, the government persists that the legislative intent underlying the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "1970 Act"), which bore Section 841(a)(1), evinces a finding that Congress intended the act to reach extraterritorially. To be sure, the federal courts routinely recite a similar perception of the legislative history of the 1970 Act. The courts opine that Congress promulgated the 1970 Act with the intention of 1) preventing the United States from being used as a conduit for narcotics trafficking; 2) limiting the risk of violence to the public that is associated with "any" (read domestic and international) transportation and distribution of illegal drugs; and 3) cooperating with other nations in establishing effective control over international traffic. See, e.g., Bonfant, 660 F.Supp. at 511–12 (citations omitted). See also Gomez–Tostado, 597 F.2d at 172–73. Thus, it might rightfully be said that it would be "absurd" not to find that Congress intended the

The line of cases cited by the defendant arise from Section 841(a)(1) prosecutions for drugs seized from vessels on the "high seas" or waters outside United States territory. *See United States v. Hayes*, 653 F.2d 8, 11 (1st Cir.1981); *United States v. Arra*, 630 F.2d 836, 837 (1st Cir.1980); *United States v. Orozco–Prada*, 732 F.2d 1076, 1079 (2d Cir.1984), *cert. denied sub nom. Forand v. United States*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984). In such circumstances, it is beyond peradventure that the government must demonstrate that the defendant intended to distribute the contraband in the United States.[8] *See, e.g., Hayes*, 653 F.2d at 16 n. 7. *See also id.* at 15–16, *citing United States v. Baker*, 609 F.2d 134, 139 (5th Cir.1980); *Arra*, 630 F.2d at 840. Therefore, the government cannot rely on the argument it proffers here, i.e., that the intent element is satisfied by the mere presence of the contraband in the United States—even if that presence were made possible solely by the government's extraterritorial seizure itself.[9]

In light of the foregoing, this Court therefore FINDS that there is NOT PROBABLE CAUSE to believe that the defendant, ANDREA CAFIERO, commit-

---

statute to reach "international drug dealers who make stopovers in the United States...." *Bonfant*, 660 F.Supp. at 512, *citing Muench*, 694 F.2d at 32. But that is not to say that the legislative history of the statute supports a finding that Congress intended to reach—or had the authority to do so—the international drug dealer who does not willingly enter the United States or intend to distribute his wares in this country.

8. The defendant's cases also suggest an underlying reliance on the legislative history of the 1970 Act, but for the proposition that Congress did not indicate an obvious and express intent to reach vessels on the high seas. As the First Circuit noted in *Hayes*, a prosecution following the seizure of thirteen tons of marijuana from an American boat on the high seas, the history is not so clear:

Others who have studied the provision have also concluded that [Section] 841(a)(1) would not apply in a case such as this one. Thus, the Department of Justice and the Drug Enforcement Administration testified before Congress on proposed legislation enacted in 1980 that the provision at issue here (unfortunately, in their view) did not apply to American ships on the high seas. Congress accepted that view, noting, for example, that the 1970 law "inadvertently contained a section repealing the criminal provision under which drug smugglers apprehended on the high seas were prosecuted without creating a new provision to replace it." And, Congress enacted a new provision that expressly applies to those who possess controlled substances *in Amer-*

*ican vessels* on the high seas, 21 U.S.C. [§ ] 955a; this new law does not require proof of intent to distribute within the United States. This case, however, was brought under the 1970 Act.

*Hayes*, 653 F.2d at 16 (citations omitted) (emphasis supplied).

Because of this "vacuum" of cases in which it was difficult to show the defendant intended to produce effects within the United States, Congress promulgated additional statutes to foster successful prosecutions following extraterritorial maritime seizures. *See Orozco–Prada*, 732 F.2d at 1088. As such, the Court is not persuaded that Congress intended the 1970 Act to reach defendants who are seized outside the United States. And although Congress attempted to fill the void left by the 1970 Act with statutes that reached maritime vessels outside territorial waters, *see id.citing* 21 U.S.C. § 955a, it neither modified the 1970 Act to clearly reach aircraft outside American airspace nor promulgated new statutes designed to reach such aircraft.

9. In the paradigm suggested by the government, American authorities could seize maritime vessels in international water, wait to search them until after the vessels were brought into American waters, and if contraband were found at that time, obfuscate the requirement that the government needs to show intended distribution in the United States. Thus, the government's supposition of the law renders the First Circuit's extraterritorial seizure-Section 841(a)(1) case law a nullity.

ted the offense with which he is charged in the complaint, violation of 21 U.S.C. § 841(a)(1). In that the Court has found that there is not probable cause, the issue of conditions of release does not obtain. Accordingly, this court has no alternative but to dismiss the complaint against the defendant and to discharge him to the custody of his lawyer and the Italian consulate.

SO ORDERED.