**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Terencio AHUMEDO–AVENDANO, Wynford Taylor–Walton, Henner Saktarriago Holgin, Emiro Jose Cueto–Gazabon, Gustavo Garcia–Patron, Alvaro Posada–Naves, Gabriel Mena Chaverra, Federico Segundo Cantillo–Obispo, Eduardo Flores Dominguez, Luis Vicente Suarez–De Armas, Defendants–Appellants.**

No. 87–5742.

United States Court of Appeals,
Eleventh Circuit.

May 3, 1989.

Kathy Hamilton, Coconut Grove, Fla., for Avendano.

Blas E. Padrino, Miami, Fla., for Holgin.

Michael G. Smith, Ft. Lauderdale, Fla., for Cueto–Gazabon.

Mario S. Cano, Coral Gables, Fla., for Garcia–Patron.

Dexter W. Lehtinen, U.S. Atty., William T. Shockley, Linda Collins Hertz, and Harriett R. Galvin, Asst. U.S. Attys., Miami, Fla., for plaintiff–appellee.

Fernando E. Heria, Hialeah, Fla. (court appointed), for Posada–Naves.

Jose R.E. Batista, Diaz & Batista, P.A., Hialeah, Fla. (court appointed), for Chaverra.

Yolanda Morales, P.A., Miami, Fla. (court appointed), for Cantillo–Obispo.

Ellen L. Leesfield, P.A., Coral Gables, Fla. (court appointed), for Dominguez.

Leon E. Tozo, Coconut Grove, Fla. (court appointed), for Suarez–De Armas.

Milton Hirsch, Miami, Fla. (court appointed), and Mark H. Hilde Brandt, P.A., Coral Gables, Fla., for Taylor–Walton.

Before TJOFLAT and EDMONDSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

In this appeal, the defendants below challenge their convictions under 46 U.S.C. app. § 1903(a), (g) & (j) (Supp. IV 1986) for possession of and conspiracy to possess on board a vessel subject to the jurisdiction of the United States more than one thousand kilograms of marijuana with intent to distribute. We affirm.

I.

On April 1, 1987, at approximately 8:00 p.m., the U.S.S. *McCloy*, a United States

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Navy frigate, detected a vessel six to eight miles off the western coast of Jamaica in Jamaican territorial waters. The vessel was heading in a northerly direction toward the coast of Cuba, crossing at the closest point between Jamaican and Cuban territorial waters in order to minimize the length of its passage through international waters. The *McCloy* followed the vessel at a distance of six to ten nautical miles for the next five and one-half hours.

In the early morning hours of April 2, 1987, the vessel left Jamaican waters and entered the high seas. The waters were rough with six- to eight-foot waves. The *McCloy* closed to within one nautical mile of the vessel and observed that the vessel was moving too fast for the rough sea conditions and was beating heavily into the waves. Coast Guard officers stationed aboard the *McCloy* attempted to establish radio communication with the vessel in English, Spanish, and French. The vessel, however, failed to respond to these communications, and the *McCloy* closed to within one hundred yards.

The *McCloy* directed a spotlight at the vessel and observed that it was a fishing trawler approximately fifty to fifty-five feet in length with the name *Orion I* on its superstructure. Contrary to international custom, the vessel had no name or home port on its stern. No flags were being flown aboard the *Orion I*, even though a nation's flag is customarily flown, even at night, when a vessel is underway. Officers aboard the *McCloy* continued their efforts to establish communication by employing the ship's radio and loudhailer, as well as using signal flags and flashing signal lights. There was still no response from the *Orion I*.

Eventually, a light was turned on inside the vessel's pilothouse, revealing the presence of three men. One of these men came out of the cabin and raised a Bahamian courtesy flag. At this point, the Coast Guard officers contacted Bahamian officials to request a "Statement of No Objection," authorizing the *McCloy* to enforce United States laws aboard the *Orion I*. At approximately 4:45 a.m., after a wait of approximately one and one-half hours, the Bahamian government advised that the *Orion I* was not of Bahamian registry and that there was no objection to the enforcement of United States laws on board the vessel.

Coast Guard officers, using the radio and the loudhailer from a distance of approximately fifty yards and communicating in English and Spanish, then ordered the *Orion I* to stop and prepare to be boarded. The *Orion I* did not stop and bumped into the port quarter of the *McCloy* as the two ships proceeded parallel to each other. The *Orion I* then made a sharp ninety degree turn to starboard and proceeded on a course which would have caused it to collide with the port bow of the *McCloy*. The *McCloy* reversed its engines and the *Orion I* narrowly missed hitting the *McCloy*'s bow; the bow of the *McCloy*, however, struck the starboard quarter of the *Orion I*, causing minor damage to the *Orion I*. Immediately after this collision, one of the individuals in the pilothouse on the *Orion I* came outside, began putting on a life jacket, and proceeded toward the stern of the *Orion I*.

Coast Guard officers, using the radio and the loudhailer and communicating in English and Spanish, then informed the *Orion I* that if it failed to stop, shots would be fired into the vessel to force it to stop. The *Orion I* did not stop. The *McCloy* therefore proceeded to fire three short bursts of .50 caliber machine gun fire across the *Orion I*'s bow. The *Orion I* was warned to stop before and after each burst of machine gun fire and there were intervals of five minutes between each firing. Finally, after over twenty-five rounds of ammunition had been fired, the *Orion I* stopped its engines. The *Orion I* was stopped at approximately 5:30 a.m. in international waters, fifty nautical miles from Jamaica and twenty nautical miles from Cuba.

A boarding party of Coast Guard officers subsequently boarded the *Orion I* to check its registration and documentation. At that point, twelve men came out of the vessel's cabin, and Petty Officer Fernando

Torres directed them in Spanish to assemble at the stern of the vessel. The ten appellants in this case were among these twelve individuals.

Appellant Wynford Taylor–Walton questioned Officer Torres concerning the purpose of the boarding. Officer Torres responded that the Coast Guard was there to check the documentation and registration of the vessel. Officer Torres asked to see the master of the *Orion I*, but none of the crew would identify the master of the vessel. The Coast Guard officers then informed the crew that they were being temporarily detained, not arrested.

Immediately after boarding the *Orion I*, the Coast Guard officers performed a personnel sweep, checking all man-size compartments for weapons and additional men who could pose a danger to the boarding party or the crew of the *Orion I*. After checking the pilothouse, captain's cabin, crew's quarters, galley and mess, the sweep team went to the hatch on the main deck to check the main hold for additional persons. They cut a rope securing a tarp over the hatch, removed one of the three unsecured hatch covers and discovered 289 bales of marijuana weighing over 21,000 pounds. The marijuana was later valued at $300 to $350 per pound for a total value in excess of $6 million.

The *Orion I* was then seized and its crew was arrested and transported to the *McCloy*. A more thorough search of the

*Orion I* revealed what appeared to be a Honduran registration document in a chart drawer in the pilothouse. Officer Torres had not asked for the documentation because the identity of the captain had not been determined and the marijuana had been found shortly after boarding. Although Officer Torres had told Taylor–Walton that the purpose of the boarding was to check the vessel's documentation, no claim of nationality was made by the crew and none of the crew members produced any registration documents. No Honduran flag was found aboard the vessel. A torn flag which could have been the flag of Colombia, Venezuela or Ecuador was found in the pilothouse.

The *McCloy* transported the crew of the *Orion I* to the United States Naval Base at Guantanamo Bay, Cuba. A crew of Coast Guard and Navy officers were placed on board the *Orion I*, which followed the *McCloy* to Guantanamo Bay. The Coast Guard then flew the appellants from Guantanamo Bay to Opa Locka, Florida; there, they were turned over to the custody of Drug Enforcement Administration agents. The *Orion I*, still carrying the marijuana, was later towed by a Coast Guard cutter to the Coast Guard Base in Miami Beach, Florida.

## II.

On appeal, appellants raise two issues that we find worthy of discussion.[1]

---

1. In addition to these issues, appellants make two other claims. First, appellants argue that the evidence was insufficient to convict. We conclude that the record provides ample evidence upon which the jury could have relied in convicting the appellants. In addition to the evidence related in text, we note that the record also established that although the *Orion I* was a fishing vessel, it was not equipped for fishing. The wire fish traps located on the deck of the *Orion I* could not be used to catch fish because there were no openings in the traps which would allow the fish to enter the traps. There were no weights in the fish traps, nor were there any rings, lines or buoys to attach to the fish traps to mark their positions in the water. The fishing boom was not operational. There was no bait in the fish traps or anywhere on the *Orion I*, nor was there any ice on the *Orion I* to preserve fish which might have been caught.

Second, the appellants challenge the constitutionality of the "substantial assistance" provision of the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1007(a), 100 Stat. 3207–7 (codified at 18 U.S.C. § 3553(e) (Supp. IV 1986)). Under this section, a defendant who provides substantial assistance to other Government investigations may be given a reduced sentence. Appellants fail to allege that they provided such assistance—as a result, we conclude that appellants have no standing to challenge the constitutionality of this provision. *See, e.g., United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir.1985) (holding defendant had no standing to attack constitutionality of provisions of Bail Reform Act which were not implicated by the facts of his case). In any case, we note that appellants' argument is foreclosed by our decision in *United States v. Musser*, 856 F.2d 1484, 1487 (11th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989), upholding

## A.

Appellants first argue that the trial court erred in refusing to dismiss their indictment for want of proper venue. The appellants in this case were convicted for violations of the Maritime Drug Law Enforcement Act, 46 U.S.C. app. §§ 1901–1904 (Supp. IV 1986) (the MDLEA). The MDLEA contains the following venue provision:

> Any person who violates this section shall be tried in the United States district court at the point of entry where that person enters the United States, or in the United States District Court of the District of Columbia.

*Id.* § 1903(f). The parties' dispute centers on the proper definition that should be given to the term "the United States." Appellants argue that the term "the United States" encompasses the naval installation at Guantanamo Bay, which therefore was the point at which they first entered the United States; because Guantanamo Bay lies outside any judicial district, they contend that venue was proper only in the District of Columbia. The United States, on the other side, argues that Guantanamo Bay is not within the scope of the term "the United States," as used in the context of section 1903(f).

If a disputed word or phrase has no statutory definition,[2] we will look to the term's plain and ordinary meaning. *See United States v. Porter*, 591 F.2d 1048, 1053 (5th Cir.1979) ("The statute does not define the terms. That being so, we must assume that Congress used these words as they are commonly and ordinarily understood.");[3] *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 58 (5th Cir.1978) (same); *United States v. Thomas*, 567 F.2d 299, 300 (5th Cir.1978) (same). In its most restricted sense, the term "the United States" may refer only to the geographic region encompassed by the fifty individual states. In addition, however, we note that the term commonly refers to other areas within the exclusive control of the federal government such as the District of Columbia. Puerto Rico, the Virgin Islands, Guam, American Samoa, and other federal territories also fall within this group. Finally, we note that at its broadest, the term may refer to all lands controlled by the United States, thus encompassing military bases in foreign countries, American embassies and consulates, and any other property owned or leased by the United States.

Ordinarily, we think that the term "the United States," used in a geographic sense, refers to the fifty states and the District of Columbia. In the context of section 1903(f), however, such an interpretation is problematic, for it would remove venue over violations of the MDLEA from the United States district courts that are in the federal territories.[4] Nothing in the MDLEA indicates that Congress intended such a result; indeed, the clear purpose of the Act was to facilitate the prosecution of narcotics offenders. We have no doubt that Congress intended the district courts in such areas as Puerto Rico and the Virgin Islands to have the power to try violations of the Act. *See, e.g., United States v. Barrio Hernandez*, 655 F.Supp. 1069 (D.P. R.1987) (prosecution under 21 U.S.C. § 955a (1982), predecessor codification of section 1903); *United States v. Vouloup*, 625 F.Supp. 1266 (D.P.R.1985) (same). We conclude, therefore, that the meaning of the term "the United States" is ambiguous on the face of the statute.

---

the constitutionality of the substantial assistance provision.

2. The United States Code provides a variety of generally inconsistent definitions for the term "the United States," *see, e.g.,* 18 U.S.C. §§ 5, 7(3) (1982); 21 U.S.C. § 802(26) (1982); 50 U.S.C. § 195 (1982); none of these definitions, however, applies to the specific provisions of 46 U.S.C. app. § 1903(f).

3. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court

adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

4. In addition to the fifty states and the District of Columbia, there are federal district courts in Puerto Rico, *see* 28 U.S.C. § 119 (1982), the Virgin Islands, *see* 48 U.S.C. § 1611 (Supp. IV 1986), Guam, *see id.* § 1424, and the Northern Marianas Islands. *See id.* §§ 1694, 1694a (1982 & Supp. IV 1986).

Because the language of section 1903(f) is ambiguous, we turn to an examination of the available extrinsic evidence to shed light on the intent of Congress. The House report accompanying the MDLEA[5] states that "[a]ncillary provisions governing venue ... are included—consistent with ... parallel provisions of existing law and their judicial interpretation." H.R.Rep. No. 323, 96th Cong., 2d Sess., at 11 (1980). The "parallel provision" with which section 1903(f) is meant to be consistent is 18 U.S.C. § 3238 (1982), which is the general venue provision for offenses not committed in any district. *See United States v. Liles*, 670 F.2d 989, 991 (11th Cir.), (holding that 21 U.S.C. § 955a(f), the predecessor of section 1903(f), should be read *in para materia* with section 3238), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). That provision states as follows:

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238 (1982). An examination of this general venue provision reveals that the *district* into which the defendant is first brought controls venue.

We conclude that Congress did not intend to depart from the rule of venue established under 18 U.S.C. § 3238 when it enacted section 1903(f). As a venue provision, section 1903(f) has a distinctively judicial context. In construing "the United States" to mean that geographic area encompassed within a judicial district, we pay heed to this context. We conclude, therefore, that on the facts of this case venue would have been proper in either the District of Columbia or in the Southern District of Florida—the point at which the appellants first entered a judicial district of the United States. The district court therefore did not err in concluding that venue was proper in the Southern District of Florida.

## B.

■ As their second assignment of error the appellants argue that the use of military force to effect their arrest violated the Posse Comitatus Act, which provides as follows:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (1982).[6] At trial, appellants did not raise this objection until the

---

**5.** Section 1903(f) had its genesis in section 1(f) of the Coast Guard—Importation of Controlled Substances—Enforcement Act, Pub.L. No. 96–350, 94 Stat. 1159 (1980), which was codified at 21 U.S.C. §§ 955a–955d (1982). The Coast Guard Authorization Act, Pub.L. No. 99–640, § 17, 100 Stat. 3552 (1986), amended Pub.L. No. 96–350 by striking virtually the entire act, and then reenacting it in more detail. This expanded version of the act was entitled "the Maritime Drug Law Enforcement Act," and was recodified at 46 U.S.C. app. §§ 1901–1904 (Supp. IV 1986). The wording of the venue provision was not altered by the amendment. This opinion refers to both the current act and its predecessors as the MDLEA.

**6.** The Posse Comitatus Act does not expressly regulate the use of naval forces as a posse comitatus; the courts of appeal that have considered this question, however, have concluded that the prohibition embodied in the Act applies to naval forces, either by implication or by virtue of executive act. *See United States v. Roberts*, 779 F.2d 565, 567–68 (9th Cir.), *cert. denied*, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986); *United States v. Del Prado–Montero*, 740 F.2d 113, 116 (1st Cir.), *cert. denied*, 469 U.S. 1021, 1042, 1164, 105 S.Ct. 441, 527, 924, 83 L.Ed.2d 366 (1984); *United States v. Chaparro–Almeida*, 679 F.2d 423, 425 (5th Cir.1982) (in dicta), *cert. denied*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1004 (1983); *United States v. Walden*, 490 F.2d 372, 374–76 (4th Cir.), *cert. denied*, 416 U.S. 983, 94

Government concluded its case; at that time, the appellants moved to dismiss the indictment, and the court denied their motion.

Federal Rule of Criminal Procedure 12 provides, in pertinent part, that:

> Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
>
> (1) Defenses and objections based on defects in the institution of the prosecution....

Fed.R.Crim.P. 12(b). The rule further provides that:

> Failure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

Fed.R.Crim.P. 12(f). The appellants were aware that naval forces were used to effect their arrest; they therefore could have made their objection prior to trial. Appellants, however, argue that the United States bears the burden of showing it did not violate the Posse Comitatus Act.

Appellants confuse the burden of persuasion with the burden of coming forward. The Government need show compliance with the posse comitatus doctrine only after the defense raises the issue. *See United States v. Garcia,* 672 F.2d 1349, 1368–69 & n. 34 (11th Cir.1982). Because of appellants' procedural default, the district court did not err in denying appellants' motion to dismiss for violation of the posse comitatus doctrine.

### III.

The judgment of the district court is AFFIRMED.

S.Ct. 2385, 40 L.Ed.2d 760 (1974). Given appellants' procedural default, we need not decide

this question at this time.