[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 26, 2007
THOMAS K. KAHN
CLERK

No. 05-15021

D.C. Docket No. 02-20548-03, 04-CR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

IVAN LOPEZ-VANEGAS,
DORIS MANGERI SALAZAR,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(July 26, 2007)**

Before CARNES, WILSON and WALTER,* Circuit Judges.

WALTER, District Judge:

---

\* Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

Doris Mangeri Salazar ("Salazar") and Ivan Lopez-Vanegas ("Lopez") appeal their convictions on one count each of conspiracy to possess with the intent to distribute five kilograms or more of a mixture and substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), and 21 U.S.C. § 846. The Government alleged that Salazar and Lopez brokered a deal between a Colombian drug trafficking organization headed by Juan Gabriel Usuga ("Usuga") and a Saudi Arabian Prince, Nayef Al-Shaalan (the "Prince"), to transport cocaine on the Prince's airplane from Caracas, Venezuela to Paris, France, for distribution in Europe.

On appeal, Lopez and Salazar assert, inter alia, that the conduct of which they were accused, and for which they have been convicted, does not violate 21 U.S.C. §§ 841 and 846. Finding that Salazar and Lopez have committed no crime against the United States, the judgments of conviction and sentences issued by the district court are **VACATED**.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Course of Proceedings and Disposition Below.

On January 16, 2003, the grand jury returned a second superseding indictment

---

[1]Lopez and Salazar also argue on appeal (1) that the Government committed a Brady violation by concealing post-cooperation drug trafficking by Usuga; (2) that the district court erred in permitting the Government to cross-examine Salazar with regard to the Prince's alleged prior indictment; and (3) that the district court erred in excluding cross-examination of the Government's witnesses and extrinsic evidence regarding a scheme to obstruct justice. Because we vacate the conviction in this case, these issues are moot.

charging the Prince, Jose Clemente ("Clemente"), Lopez and Salazar, in one count (Count 1) with conspiracy to possess with intent to distribute five or more kilograms of cocaine "in Miami-Dade County, in the Southern District of Florida, and elsewhere," in violation of 21 U.S.C. §§841[2] and 846. (DE:67:1). Clemente was charged in Count 2 with conspiring to launder money.[3] The Prince and Clemente have not been arrested. Appellants Lopez and Salazar were tried together.

A two-month long trial began on March 7, 2005. Immediately after the prosecutor's opening statement, Salazar moved for judgment of acquittal and asserted that the Government's description of the evidence portrayed an agreement to transport cocaine from Venezuela to France, not an agreement to possess or distribute cocaine in the United States. (DE:533:160-61). In response, the Government argued that the "drug conspiracy touches here" because the conspirators held meetings in Miami. (DE:533:161). The district court denied the motion. (DE:533:161). The appellants again moved for judgments of acquittal at the close of the Government's case.[4] (DE:553:97-112). The district court reserved ruling. (DE:553:128). Lopez and

---

[2]Title 21 U.S.C. § 841 provides, and provided at the time of the charged conspiracy, in pertinent part, that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . . ."

[3]The original indictment, returned on June 27, 2002, charged Clemente alone with conspiring to launder money. (DE:1).

[4]Lopez and Salazar joined in each other's objections and motions. (DE:534:18).

3

Salazar renewed their motions for judgment of acquittal at the close of all evidence, but their motions were denied. (DE:563:34-35,63).

On May 3, 2005, the jury found both Lopez and Salazar guilty of the conspiracy charged in the superseding indictment. (DE:565:3; DE:433-434). Salazar and Lopez timely filed post-trial motions for judgment of acquittal as well as motions for a new trial. (DE:441-45, 450). The Government opposed these motions. (DE:463). The district court denied defendants' motions without an evidentiary hearing. (DE:480).

On August 29, 2005, the district court sentenced Lopez and Salazar to 280 and 292 months' imprisonment, respectively. (DE:493; DE:495). Both defendants also received a five-year term of supervised release, a $100 special assessment and a fine of $25,000. (Id.). The appellants are presently incarcerated.

## B. **Statement of the Facts.**

### 1. The Usuga Group.

By 1998, Usuga, Carlos Ramon ("Ramon"), Oscar Campuzano ("Campuzano") and Bernard Sanchez ("Sanchez") (collectively, the "Usuga Group") had become partners in a large-scale Colombian cocaine trafficking organization out of Medellin, Colombia. (DE:534:11-12; DE:549:18-19). Usuga was the leader (DE:534:11-12; DE:544:52-54; DE:547:17); Campuzano was in charge of collecting money

(DE:548:73-74); Sanchez was responsible for transporting, packaging, warehousing and labeling the cocaine in South America (DE:548:16, 81-82); Ramon handled transportation abroad, including the receipt and delivery of cocaine at its destination. (DE:548:73). Clemente, a Spaniard, was also closely affiliated with the group, though not a member, and specialized in laundering the Usuga Group's drug money. (DE:534:50; DE:541:101-03; DE:544:30-42).

Evidence at trial showed that the Usuga Group exported at least 50 tons of cocaine during the 1990s throughout Europe and North America. The Group also provided transportation services to other traffickers. (DE:539:43-50; DE:544:26-30; DE:549:20-21; DE:551:33-34). The Usuga Group's trademark transportation method was to hide cocaine within isotanks containing petro chemicals. (DE:539:50-51, 115-16; DE:544:28-30; DE:549:20-21).

By January 2000, all four members of the Usuga Group had been indicted in Miami and elsewhere in connection with, among other investigations, Operation Millennium, which targeted high-level narcotics traffickers for extradition. (DE:402:2; DE:544:44-45). All four members of the Usuga Group surrendered, entered into plea agreements and cooperated with the Government. (DE:534:11-12; DE:545:81-95; DE:547:115-24; DE:548:98-129; DE:549:11-17; DE:551:29-31, 57-58; GX58). In particular, Usuga and Campuzano pleaded guilty only to money

5

laundering in connection with Operation Millennium, and each received a reduced sentence of 34 months. (DE:534:19-23; DE:545:85-91). Their sentences were later reduced to 22 and 23 months, respectively. (DE:534:32-34; DE:545:91-95). Both Usuga and Campuzano had served their time before testifying at trial. (DE:534:37; DE: 545:95-96).

Sanchez pleaded guilty to drug trafficking and received a reduced sentence of 156 months, with a Rule 35 motion to reduce his sentence pending. (DE:547:115-24). Ramon pleaded guilty to drug trafficking and received a reduced sentence of six years, with the hope of an additional sentence reduction. (DE:549:9-15).

### 2. The Charged Conspiracy - "The Paris Load".

Usuga testified at trial that the plans behind the Paris Load began in 1998, when Lopez approached Usuga in Medellin and told him about a "friend of a woman friend of mine" with whom they could engage in financial transactions or deals in Europe. (DE:534:40-42, 75). Usuga later learned that Salazar was Lopez's "woman friend," and that the Prince was Salazar's friend. (DE:534:48). Over the course of a year, the Usuga Group, Clemente, Lopez, the Prince and Salazar had meetings

across the globe[5] where, according to the Government, the group conspired to purchase cocaine in Colombia, to be shipped from Venezuela to Paris, France, for distribution in Europe. For purposes of this appeal, the Court will assume that all facts alleged by the Government are uncontested. With that in mind, the following meetings took place in Miami, Florida:

     a. <u>Miami, Florida ("Porto Fino") – Mid-September 1998</u>. In mid-September, 1998, Usuga, Ramon and Campuzano met at the "Porto Fino," Ramon's South-Beach condominium. (DE:549:45; DE:545:107). Neither Lopez nor Salazar was present. At this meeting, the group discussed "the way we were going to set up this organization." (DE:549:46). "Various tasks" were assigned after Usuga told his cohorts that "he had been able to confirm that in fact . . . [the Prince] had a bank in Geneva and that [the Prince] was who he said he was." (DE:549:49). Usuga told the group that he would soon be traveling to Saudi Arabia for further discussions. (DE:534:104). Campuzano confirmed Usuga's account of this Miami meeting. (DE:545:102-108).

At this meeting, it was agreed that "there would be two groups . . . [the Prince's] group would consist of [the Prince] and [Salazar] . . . [Salazar would]

---

[5]Meetings were held in Marbella, Spain, Geneva, Switzerland, Saudi Arabia, Aruba, Colombia and Miami. The Court will focus on the Miami meetings as they are the only events related to the charged conspiracy that took place in the United States.

receive a commission from [the Prince]." (DE:549:50). Lopez would receive his commission from the Usuga Group for each kilogram transported. (Id.). Usuga would handle direct communications with the Prince; Ramon would be responsible for the movement of the cocaine; and Campuzano "would be responsible for setting up the straw corporations abroad." (Id.).

Usuga presented two proposals: one possibility involved the shipment of ten or twenty tons of cocaine using isotanks from Venezuela to Saudi Arabia for re-export to New York[6]; the second proposal was to transport cocaine in the Prince's

---

[6]There is no dispute that Usuga, not the Prince, wanted to send the shipment to New York. (DE:535:72-77). Further, the Government has not asserted that shipment to New York was anything more than a one-sided fleeting thought.

In its appellate brief, the Government relies solely upon the "domestic conspiratorial conduct" of Lopez and Salazar to support its argument that the district court had jurisdiction, or as is discussed below, that a crime was actually committed under 21 U.S.C. §§ 841(a)(1) and 846. Brief for the United States, pp. 28-29. Further, the Government's subsequent arguments presume that there was no agreement to distribute illegal narcotics in the United States, e.g., "[t]he law does not impose upon §§ 846 and 841(a)(1) any requirement that the object of such a conspiracy must be to possess or distribute cocaine in the United States"; "[b]ecause a defendant may be convicted of a substantive offense under §841(a)(1) without intending to distribute narcotics in the United States, it follows that defendants like Salazar and Lopez may be guilty of conspiracy to possess with intent to distribute cocaine, in violation of §846, as long as they or others have engaged in conspiratorial activities to violate that statute in the United States." Brief for the United States, pp. 29-30. Further, as noted above, in response to Salazar's motion for judgment of acquittal, the Government argued that "the drug conspiracy touches here" **because the conspirators held meetings in Miami**. (DE:533:161).

In other words, the Government does not rely upon Usuga's statement that he initially wanted to ship cocaine to New York rather than Paris. Thus, this Court finds that the Government has abandoned any such argument. See Sepulveda v. United States Attorney General, 401 F.3d 1226, 1228 n. 2 (11th Cir. 2002) (concluding that the petitioners abandoned an issue by failing to raise it in their initial appellate brief); see also United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (failure to offer argument on issue on appeal results in

8

airplane from Venezuela to Saudi Arabia. (DE:549:51-60).

b. <u>Miami, Florida (Dinner at The Forge Restaurant) – November/December 1998</u>. In November or December of 1998, Ramon, Salazar, Clemente, Lopez, Usuga and Pepé Gugliatto met for dinner at The Forge. (DE:549:69-70). There, Lopez and Salazar introduced Gugliatto to Usuga. (DE:534:114, 118). Salazar assured Usuga that Gugliatto was a close friend akin to a relative "with whom [Usuga] could comfortably talk." (DE:534:119). According to Ramon, Gugliatto was Lopez's personal friend and came with good references from Lopez and Salazar (DE:551:67). Two matters were discussed at this Miami meeting: the Brazil shoe deal,[7] and Gugliatto's potential for "partnership" with the Prince. (DE:549:73-75). Salazar sat with the group at the Forge; "she gave her opinions" though Ramon could not recall her exact words. (DE:549:76).

---

abandonment of that issue); <u>Johnson v. Wainwright</u>, 806 F.2d 1479, 1481 n. 2 (11th Cir. 1986) (State did not raise defense of failure to exhaust state remedies on appeal, and thus waived any right to claim such a defense); <u>Adler v. Duval County School Board</u>, 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997) ("[I]t is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate.").

[7]Gugliatto proposed sending cocaine from Brazil to the Port of Miami; the cocaine would be hidden in a commercial cargo container of shoes where Gugliatto could access them "before Customs could touch them." (DE:549:73, 77). Lopez contributed $350,000 to be part of the Brazil shoe deal, which would have involved "a ton of units," but that deal never materialized. (DE:548:93; DE:534:131-32). The Government conceded, and the district court acknowledged and ***instructed the jury***, that the Brazil shoe deal was a separate ***uncharged*** conspiracy that was offered simply to explain the relationship among the participants. (DE:560:152-55); see also (DE:463:9-10; DE:534:106-13; DE:546:28-33 DE:549:71-73; DE:567:44).

Ramon testified that another meeting occurred at the Biltmore Hotel in Miami, involving Usuga, Ramon, Clemente, Salazar and Gugliatto. (DE:549:77-79). At that meeting, "some comments were made" about the potential Prince deal, but nothing specific. (Id.). Usuga, however, testified that they did not discuss the deal at this meeting. (DE:534:114, 126-27).

c. Miami, Florida (Don Shula Hotel) – March 5, 1999. On March 5, 1999, Usuga met Salazar, Lopez and Gugliatto at the Don Shula Hotel in Miami. (DE:537:5-7). The brief discussion at this meeting centered on the upcoming arrival of the Prince in Caracas, Venezuela for which "everything was ready." (DE:537:8). Lopez stated that he would notify Usuga of the Prince's arrival date, a few days prior to that date. Usuga replied "that we would be waiting for that." (DE:537:8).

d. Miami, Florida (Tides Hotel) – July 1999. After the Paris Load was successfully purchased in Colombia, transported to Caracas, Venezuela, and shipped to Paris, France on May 16, 1999, most of the load was distributed, but 804 kilograms of cocaine were seized by French law enforcement on June 3, 1999. (DE:542:50-54, 62). In July 1999, Usuga, Campuzano, Clemente and Salazar met at the Tides Hotel in Miami Beach to discuss the amount of money owed to the Prince, who had already been paid $5,000,000 from Lopez's sale of 250 kilograms of cocaine. (DE:546:16). According to Usuga and Campuzano, Salazar demanded payment of her commission

"for the Paris operation" and an additional $10,000,000 owed the Prince, but Usuga refused. (DE:537:120-21; DE:546:16-17). Salazar insisted "that the money was owed to the Prince and it had to be paid." (DE:546:17). Salazar further insisted that Usuga was "responsible for the incident" and, thus, was responsible for her commission. (DE:537:121).

e. Recorded Conversations With Lopez. After Usuga was arrested and was cooperating with the Government, he recorded a number of conversations with Lopez between April 2000 and March 2001. (DE:538:25-26; GX12 - GX21). After Campuzano surrendered and agreed to cooperate with the Government, Lopez called and Campuzano also recorded their conversation. (DE:546:20-21). Lopez's conversations with Campuzano and Usuga centered on the debts owed to the Prince, and those owed by and to[8] Lopez as a result of the Paris Load. (DE:538:61, 65; DE:539:15, 24-25, 27; DE:546:20, 42-45, 50, 53).

## II. DISCUSSION

Whether a criminal statute reaches a defendant's conduct is reviewed de novo. United States v. Calhoon, 97 F.3d 518, 523-24 (11th Cir. 1996).

Appellants assert that the agreement to ship cocaine from Colombia to

---

[8]In speaking with both Campuzano and Usuga, Lopez sought a refund from Campuzano on the aborted Brazil shoe deal.

Venezuela to Saudi Arabia to France for distribution throughout Europe does not violate 21 U.S.C. § 846 because the object of the conspiracy – the possession and distribution of cocaine on foreign soil – is not a violation of 21 U.S.C. § 841(a)(1). Thus, the district court should have granted defendants' motion for acquittal at the close of the Government's case. The Government asserts that the defendants' conduct[9] was encompassed by the prohibitions of 21 U.S.C. § 846 and § 841(a)(1), forbidding conspiracy to possess with intent to distribute cocaine. The issue of whether discussions occurring in the United States related to possession of controlled substances outside of the United States with intent to distribute those substances outside of the United States is a crime in the United States is <u>res nova</u> in the Eleventh Circuit. We squarely address that issue now.

Title 21 U.S.C. § 841(a)(1), in conjunction with §846, makes it unlawful for any person to conspire to possess with the intent to distribute a controlled substance, such as cocaine. Neither statute expressly requires that possession, distribution nor an act in furtherance of the conspiracy occur in the United States. A silent statute is presumed to apply only domestically. <u>Small v. United States</u>, 544 U.S. 385, 388, 125 S.Ct. 1752, 1755 (2005). Such statutes may be given extraterritorial application if the

---

[9]The Government only addresses this issue with regard to Salazar. However, Lopez adopted Salazar's Brief related to the issue of whether the conduct of Lopez and Salazar violated §§ 841 and 846. Therefore, the Court makes its determination as to both appellants.

nature of the law permits it ***and*** Congress intends it.  <u>United States v. Baker</u>, 609 F.2d 134, 136 (5th Cir. 1980).  "Absent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved."  <u>Id.</u>, at 136.  The United States Supreme Court explained the issues involved with a statute silent as to its extraterritorial application:

> The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed out side {*sic*} of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas

and foreign countries, but allows it to be inferred from the nature of the offense.

United States v. Bowman, 260 U.S. 94, 97-98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922).

Our case law, and that of our sister circuits, has applied § 841(a)(1) and § 846 extraterritorially in certain circumstances, even though Congress has not specifically expressed its intent on the matter.  See United States v. Baker, 609 F.2d 134, 139 (5th Cir. 1980); see also United States v. Gomez-Tostado, 597 F.2d 170 (9th Cir. 1979); United States v. Hayes, 653 F.2d 8, 15 (1st Cir. 1981); United States v. Muench, 694 F.3d 28 (2d Cir. 1982); United States v. Montoya, 782 F.2d 1554, 1555 (11th Cir. 1986); United States v. MacAllister, 160 F.3d 1304, 1308 (11th Cir. 1998); United States v. Holler, 411 F.3d 1061, 1064-65 (9th Cir. 2005).  However, in each of those cases some other nexus to the United States allowed for extraterritorial application of § 841(a)(1): defendants either possessed or conspired to possess controlled substances within the United States, or intended to distribute controlled substances within the United States.  Our predecessor Court made clear in Baker that § 841(a)(1) does not apply to possession outside United States territory unless the possessor intends to distribute the contraband within the United States.  Baker, 609 F.2d at 139; see Muench, 694 F.2d at 33 (discussing Baker and Hayes).  Furthermore, there can be no violation of § 846 if the object of the conspiracy is not a violation of the substantive offense.  21 U.S.C. § 846 ("Any person who . . . conspires to commit any

14

offense defined in this subchapter . . . .").  Accordingly, where, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, there is no violation of § 841(a)(1) or § 846.

Further, Congress has shown it is capable of addressing acts involving controlled substances occurring outside of the United States, and has shown it thinks it necessary to make specific provisions in the law that allow the locus to include acts of manufacture or distribution of controlled substances on foreign soil when there is an intent to unlawfully import such substances or chemicals into the United States.  See e.g., 21 U.S.C. § 959.  In 21 U.S.C. § 959, Congress specifically stated that the statute "is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."  21 U.S.C. § 959©.  Under 21 U.S.C. §§841 and 846, Congress has not stated its intent to reach discussions held in the United States in furtherance of a conspiracy to *possess* controlled substances *outside* the territorial jurisdiction of the United States, with intent to *distribute* those controlled substances *outside* of the territorial jurisdiction of the United States.

Because the Court holds that 21 U.S.C. §§ 841 and 846 do not apply extraterritorially, the conduct of Lopez and Salazar does not violate those statutes.  The judgments of conviction and sentences issued by the district court are

**VACATED**.  Accordingly, this Court need not address the other issues raised on appeal.