[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 18, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10560

_____

D. C. Docket No. 04-00226-CR-T-17-TBM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER J. BENBOW,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 18, 2008)**

Before BIRCH, CARNES and COX, Circuit Judges.

CARNES, Circuit Judge:

The facts underlying this case began like something out of a James Bond

novel but soon morphed into an international drug conspiracy sting. After the tale

was told at the district court level, Christopher Benbow was convicted of conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846. This is his appeal of that conviction.

**I.**

In the fall of 2003 Benbow, a citizen of Great Britain who lived in Estonia, learned that several Russian former KGB agents were trying to sell nine kilograms of strontium packed in circular containers. Strontium-90, a radioactive isotope of strontium, is lethal and could be used by terrorists to make dirty bombs. There is some dispute between the government and Benbow over whether the strontium for sale was of this deadly variety, but it does not matter for our purposes. The sellers offered Benbow a sizeable commission if he could find a buyer for the strontium, which was expected to sell for more than $200 million. Benbow was interested. In trying to locate a buyer, he contacted a long-time friend and business associate in Florida, Adam Elisha. Benbow believed that Elisha had ties to the American government, which Benbow thought might be interested in buying the strontium, presumably to keep it out of terrorists' hands.

Elisha instead set up a meeting with David Siegel, who claimed to have connections to the Israeli military. Siegel was actually a confidential informant for

2

the Drug Enforcement Administration.  He had convinced Elisha to cooperate with the DEA.

Benbow, Elisha, and Siegel met in a hotel room in Tampa, Florida on December 9, 2003.  There Siegel managed to turn the strontium deal into a reverse drug sting by asking Benbow if the Russian sellers would be interested in trading it for drugs, specifically a large amount of cocaine.  Benbow said that he would ask the Russians.  Later he informed Elisha that the Russians were not interested in drugs and would accept only cash for the strontium.  In early 2004, however, Benbow informed Elisha that he had found some people in England who were interested in buying a large amount of cocaine.  Benbow suggested to Elisha that Siegel could sell the cocaine to the Englishmen and then use the proceeds to purchase the strontium from the Russians.

In January 2004 Benbow, Elisha, Siegel, and another DEA undercover operative using the name Amir Farid spoke by conference call.  During that conversation, Benbow discussed the possibility of the buyers coming to the United States to inspect and pay for the cocaine.  Benbow told the other three that his buyers were interested in a large amount of cocaine, but not all at once; they wanted it delivered in installments.  Benbow agreed to meet with Elisha and Farid in the United States on February 9, 2004.

3

Benbow brought his cocaine buyers, Anthony Jones and Peter Davidson, to the United States to negotiate the drug deal with the sellers. On February 9, 2004 the three of them met with Elisha, Farid, and Siegel at a warehouse in Tampa. Jones was the negotiator for the buyers and Farid for the sellers. Jones expressed interest in purchasing the cocaine to distribute in Europe, but he noted that the parties had neither worked out where they would take possession nor discussed how the drugs might be transported from the United States to Europe. Farid said that he could arrange to have the drugs transported from the United States to Europe, or Jones could take possession of them anywhere in this country: "[Y]ou want it in Ohio, I'll give it to you in Ohio; you want it in Kentucky, I'll give it to you in Kentucky, alright?" Jones refused to commit to any plan, stating: "But let me, let me go back. I'm not going to agree or disagree on anything."

Two undercover officers from the Hillsborough County Sheriff's Office were also at that February 9, 2004 meeting. At Farid's request they placed on a table a duffel bag containing thirty kilograms of cocaine, which was meant to show the buyers what they would get if they completed the transaction. Jones and Davidson cut into one of the blocks of cocaine and sampled it. At the end of the meeting, Jones asked Farid if he could find some cocaine for Jones' personal use in Miami, but Farid refused to do so.

4

After that meeting and several follow-up telephone calls, on February 24, 2004 Farid told Benbow that the cocaine he wanted to sell to Jones had been shipped to Europe and was ready to be delivered. There had been no cocaine shipment, but Farid pretended otherwise in order to further the sting operation. Benbow agreed to meet Farid in Belgium in March to further discuss the drug transaction.

On March 9, 2004 Benbow met with Farid in Brussels, Belgium. The following day Farid met with Jones and Davidson in Bruges, Belgium. At that meeting Farid continued to discuss the cocaine deal with Jones and Davidson to see if the buyers were "ready to come up with the payments towards the purchase and delivery of the cocaine that they wanted." Because of concerns about whether Jones could handle such a large transaction, the next day Benbow introduced Farid to another potential cocaine purchaser, Patrick Jenkins. At that March 10 meeting, Jenkins and Farid talked about the possibility of Jenkins purchasing cocaine from Farid. During the next week, Benbow, Jones, and Jenkins had several more telephone conversations with Farid. In one of these conversations, Benbow told Farid that Jones had agreed to Jenkins being involved in the cocaine transaction.

In late March 2004 Benbow and Jenkins traveled to the United States and stayed for a week in Miami, where Benbow had lived for several years and still

5

owned a condominium. On March 31 the two drove up to Tampa to meet with Farid and Jones about the cocaine deal. The meeting took place on an unmarked DEA boat and was covertly recorded. Farid brought packages containing three kilograms of cocaine to the meeting. Jenkins sampled the drugs. Farid explained that the cocaine Jones and Jenkins were going to receive would have the same packaging and marking as the sample packages. Jones and Jenkins left the boat to discuss the cocaine transaction privately, and when they returned, they announced that they had agreed to purchase the cocaine from Farid in Europe.

After that meeting Benbow and Jenkins had several more telephone conversations with Farid about the financial arrangements and logistics for the cocaine deal. Farid wanted cash delivered to the United States before possession of the cocaine was transferred, but Jenkins wanted to get the cocaine first, sell it in the Netherlands, and then pay Farid with the proceeds. Jenkins and Farid had several meetings in England to continue planning the deal, and afterwards Benbow had some telephone conversations with Farid.

Jones and Jenkins agreed to buy a total of 1000 kilograms of cocaine from Farid in 250 kilogram increments. They planned to pay Farid in advance in London, where they would also get the cocaine. Jones and Jenkins agreed to place the cash in a safe deposit box, to have Benbow inspect it to make sure all of the

6

money was there, and then to give the key to Benbow to deliver to Farid. However, because Jones and Jenkins actually did not have the millions of dollars necessary to fund the deal, they intended to deliver plain paper instead of cash and pay for the drugs after selling them.

The transaction was supposed to take place on April 30, 2004, but that morning, Benbow, Jenkins, and Jones were arrested in London by British authorities. Benbow admitted to British authorities that he had met with Jones to discuss the potential purchase of cocaine from a source in Florida. He stated that he had thought Jones and Jenkins were going to provide the cash up front for the deal, but they had told him of their "plain paper" plan that morning. After his arrest Benbow was extradited to the United States, where he was indicted on a single count of conspiring to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846.

The case was tried before a jury, and after the close of the government's case in chief, Benbow moved for a judgment of acquittal, which the district court denied. Benbow then testified in his own defense, and after the defense rested, Benbow renewed his motion for a judgment of acquittal. The district court again denied the motion, and then conducted its jury charge conference. Benbow requested an instruction that the government was required to prove that the object

7

of the conspiracy was either possession or distribution of cocaine in the United States. The district court declined to give that instruction and submitted the case to the jury, which found Benbow guilty of the conspiracy charge. The district court sentenced him to life in prison.

Benbow contends that the district court erred by failing to give the jury his requested instruction. He also contends that the district court should have granted his motions for judgment of acquittal on the ground that the government's evidence was insufficient to prove the necessary connection of the crime with the United States.

## II.

While Benbow's appeal was pending, this Court decided United States v. Lopez-Vanegas, 493 F.3d 1305 (11th Cir. 2007), which addressed a somewhat similar issue. In that case the defendants had conspired to purchase cocaine in Colombia, which was to be shipped out of Venezuela to Saudi Arabia and eventually to France for distribution in Europe. Id. at 1308–10. Although the defendants held several meetings in Miami to discuss and plan the international operation, there was never any agreement to possess or distribute illegal drugs in the United States. See id. at 1309–11. The defendants were charged with conspiracy to possess with intent to distribute five or more kilograms of cocaine

8

"in Miami-Dade County, in the Southern District of Florida, and elsewhere" in violation of 21 U.S.C. §§ 841 and 846. Id.

After a two-month jury trial, the defendants in Lopez-Vanegas were convicted. Id. They argued on appeal that their conduct did not violate 21 U.S.C. § 846 because "the object of the conspiracy—the possession and distribution of cocaine on foreign soil—is not a violation of 21 U.S.C. § 841(a)(1)." Id. at 1311. We agreed, concluding that "where, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, there is no violation of § 841(a)(1) or § 846." Id. at 1313. We did note that this circuit had applied § 841(a)(1) and § 846 extraterritorially in some circumstances. Id. at 1312. Each time we had done so, however, "some other nexus to the United States allowed for extraterritorial application of § 841(a)(1): defendants either possessed or conspired to possess controlled substances within the United States, or intended to distribute controlled substances within the United States." Id.

As a result of our decision in Lopez-Vanegas, the government has conceded that: "[T]he district court committed reversible error when it refused Benbow's requested jury instruction, which would have required the United States to prove that Benbow had conspired to either possess or distribute the cocaine in the United

9

States." Government's November 30, 2007 Concession of Error Letter. This case must be sent back to the district court. The question is whether it should be sent back for retrial with directions that the omitted jury instruction be given or instead with directions that a judgment of acquittal be entered. The answer turns on whether there was enough evidence at the trial to convict Benbow of conspiring to possess or distribute controlled substances within the United States. If so, he may be retried; if not, then not. See Lopez-Vanegas, 493 F.3d at 1313; see also Monge v. California, 524 U.S. 721, 729, 118 S. Ct. 2246, 2251 (1998) ("[W]here an appeals court overturns a conviction on the ground that the prosecution proffered insufficient evidence of guilt, that finding is comparable to an acquittal, and the Double Jeopardy Clause precludes a second trial."); Burks v. United States, 437 U.S. 1, 18, 98 S. Ct. 2141, 2150–51 (1978) ("[W]e hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found evidence legally insufficient.").

### III.

We review de novo the sufficiency of the evidence supporting a criminal conviction. United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005). In doing so, we "view the evidence in the light most favorable to the Government and decide whether a reasonable juror could have reached a conclusion of guilt beyond

10

a reasonable doubt." United States v. Faust, 456 F.3d 1342, 1345 (11th Cir. 2006).

We draw all reasonable inferences from the evidence in favor of the verdict.

United States v. Robertson, 493 F.3d 1322, 1329 (11th Cir. 2007).  This standard

of review, as we have noted, is "stacked in the government's favor."  United States

v. Moore, 504 F.3d 1345, 1348 (11th Cir. 2007).

There is no evidence that Benbow and his co-conspirators intended to

distribute in this country the cocaine they wanted to purchase from the undercover

agents, but that does not preclude a conviction for violation of 21 U.S.C. §§

841(a)(1), and 846.  The statute is violated by possession of cocaine in this country

even where the intent is to distribute it outside this country.  See United States v.

Montoya, 782 F.2d 1554, 1555 (11th Cir. 1986) (upholding a defendant's

conviction under § 841(a)(1) where he possessed cocaine in this country but

intended to distribute it in Canada); see also United States v. Muench, 694 F.2d 28,

33 (2d Cir. 1982) ("In this case . . . the appellants, with intent to distribute,

possessed contraband within the territory of the United States.  The actual

possession on United States territory supplies the jurisdictional nexus and obviates

the need for proof of intent to distribute within the United States."); United States

v. Gomez-Tostado, 597 F.2d 170, 172–73 (9th Cir. 1979) (upholding a defendant's

conviction under § 841(a)(1) where he possessed heroin in this country but

11

intended to distribute it in Mexico). Benbow's own requested jury instruction recognizes as much, permitting conviction on a finding that he conspired either to possess or distribute the cocaine in this country.

The question comes down to whether the evidence, viewed in the light most favorable to the government, and drawing all reasonable inferences that way, would permit a jury to find beyond a reasonable doubt that there was an agreement on the purchase side of the negotiations. To convict Benbow of conspiracy as charged the agreement had to be between him and someone else on the purchase side, and it had to include or contemplate either direct or constructive possession of cocaine in this country before the drugs were to be distributed in another country. Farid told Benbow on February 24, 2004 that the cocaine had been moved to Europe, so any conspiracy among the would-be purchasers that included possessing the drugs in this country would have had to have been formed by that date.

There was more than enough evidence to prove that Benbow was acting on behalf of a group who wanted to purchase a large amount of cocaine. Farid testified, and the government's recording of the January 22, 2004 conference call showed, that Benbow told the purported sellers that he had located potential buyers for the cocaine. Benbow said that his buyers wanted a large amount of cocaine,

explaining that he had "met with [the buyers] today [and] they are triple positive on participating in what is a transaction." Benbow further explained that his role was to make the necessary introductions for the transaction to occur. At the end of the conference call, Benbow agreed to bring the other conspirators on the buying side to Florida so they could meet with the sellers. At that meeting, which was held on February 9, 2004, co-conspirator Jones told the purported sellers that he would take care of paying Benbow for Benbow's involvement in the transaction.

There was also plenty of evidence that Benbow and his cohorts in crime believed that the cocaine they were negotiating to purchase was located in this country. Farid testified that the purpose of the February 9, 2004 meeting, which occurred in Tampa, Florida, was "to negotiate the transportation of the cocaine to Europe, and the rate [the co-conspirators were] going to pay for it, to pay for the transportation, and just to negotiate the drug deal." The government also introduced as evidence a recording of the February 9, 2004 meeting. At the meeting Farid told Jones, who was representing the cocaine buyers, that he could arrange the transportation of the drugs to Europe or Jones could take possession of them in the United States at a location of Jones' choosing: "[Y]ou want it in Ohio, I'll give it to you in Ohio; you want it in Kentucky, I'll give it to you in Kentucky, alright?"

13

At one point another of the purported sellers, David Siegel, told Jones that if the buyers wanted "to arrange the whole circle to go and . . . start and end in the United States, you're very welcome." Jones responded that "[i]f you can do it into the next country up, I could probably do it." Siegel then told Jones that "New York is even easier," but Jones said he had "bad experiences in New York City and New York." Farid also testified that during the meeting two of the co-conspirators sampled the cocaine that the purported sellers had brought to show the purchasers what they would be getting.

The co-conspirators' goal was to distribute the cocaine outside this country. The cocaine was not going to transport itself. Someone would have to transport it for the conspiracy to succeed. Benbow and the other conspirators discussed with the purported sellers moving the cocaine to a point outside of this country. A jury reasonably could find from the evidence that the conspiracy included having the sellers transport the cocaine from this country to another at the direction of the purchasers. Those who have property, including illegal drugs, moved by others at their direction and for their purposes constructively possess that property while it is being moved. United States v. $38,000.00 in United States Currency, 816 F.2d 1538, 1544 (11th Cir. 1987); United States v. Gloria, 494 F.2d 477, 482 (5th Cir.

14

1974); United States v. Hernandez, 441 F.2d 157, 159–64 (5th Cir. 1971).[1] It follows that there is sufficient evidence that the conspiracy included an intent to at least constructively possess the cocaine in this country.

The fact that the buyer-conspirators were told on February 24, 2004 that the cocaine had been moved to Europe after the February 9 meeting does not rule out an earlier agreement among those conspirators to have the drugs moved outside of this country. If anything, it indicates that they were successful in having it done.

Our analysis is also unaffected by the fact that at the February 9, 2004 meeting Jones told Farid that he wouldn't "agree or disagree on anything" with respect to the cocaine transaction. The conspiracy in question is not one between the sellers and the buyers. Because all of the sellers were official or unofficial agents for the government they could not be co-conspirators. See United States v. Wright, 63 F.3d 1067, 1072 (11th Cir. 1995) ("[I]t takes at least two to conspire neither of which may be government agents or informers. Any agreement between the CI and [the defendant] to buy and sell cocaine can not form the basis of the conspiracy."). That Jones, the negotiator for the buyers' side, told the purported sellers that he was not going to agree to anything with them at that time, "[b]ut let

_____

[1] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

me, let me go back," does not preclude the buyers from having already agreed among themselves to try and find cocaine in this country and have it transported outside of this country for distribution elsewhere.

This case is different from <u>Lopez-Vanegas</u> because in that case the cocaine was never to be moved from a point inside the United States to a point outside of it. <u>See</u> <u>Lopez-Vanegas</u>, 493 F.3d at 1311. That cocaine was never in this country. There was no evidence in <u>Lopez-Vanegas</u> from which a jury could reasonably infer that the conspirators had ever agreed among themselves to possess, either directly or constructively, the cocaine in this country. <u>See</u> <u>id.</u> at 1308–11. In this case the jury reasonably could infer from the evidence viewed in the light most favorable to the government that Benbow was part of a conspiracy to buy cocaine in the United States and to have it transported outside of this country.[2]

## IV.

The judgment of conviction is REVERSED and the case is REMANDED for a new trial.

---

[2]The government has not argued that Benbow could be convicted on a theory of aiding and abetting the conspiracy, and accordingly we have no occasion to decide whether that is a viable theory under the evidence.